[L.A. No. 30609. July 23, 1976.]

CLARENCE GREGORY et al., Plaintiffs and Appellants, v.
McDONNELL DOUGLAS CORPORATION et al.,
Defendants and Respondents.

## COUNSEL

Cantrell & Green and Richard J. Cantrell for Plaintiffs and Appellants.

Munger, Tolles & Rickershauser, James N. Adler and Jeffrey I. Weinberger for Defendants and Respondents.

## OPINION

**RICHARDSON, J.**—The case concerns a defamation action arising from a labor dispute. We consider whether two written statements issued in connection with the dispute are libelous.

The action was brought by the president and vice president of a union, United Aerospace Workers Local 148 (Local 148), against the employer of the members of this union, McDonnell Douglas Corporation (the company) and other defendants whose capacities were not described in the complaint. Plaintiffs alleged that the communications in question contained defamatory statements and were published by defendants with knowledge of their falsity and with a reckless disregard as to their truth. Defendants demurred on the ground that both federal and state law broadly protect from liability for defamation persons making such statements within the context of a labor dispute. Defendants also asserted that the complaint was defective because it failed to plead innuendo, inducement and special damages. The trial court sustained the demurrer without leave to amend, and judgment was entered in favor of defendants. We will affirm the judgment.

The underlying labor dispute arose after a 17 cents per hour wage increase had been negotiated between the company and its employees,

including the members of Local 148. This increase was initially disallowed under the Economic Stabilization Act, but the ruling was subsequently reversed, whereupon the Cost of Living Council issued guidelines to govern the retroactive payment of the pay raise. Disagreements between the employer and employees arose as to the implementation of these guidelines, however, and the company refused to make payments to any employees until all of its unions had entered into agreements concerning the manner of implementation. Before Local 148 reached such an agreement, both the company and the union leadership distributed various written communications to members of Local 148 and their families. The union released information opposing the company's position regarding the retroactive payments. In response, the company issued two statements, a bulletin of March 29, 1974, and a letter of April 23, 1974, which statements are the subjects of the libel action.

The bulletin of March 29, 1974, reads in part: "The Company has made every effort to reach . . . [an] understanding with officials of UAW Local #148 and we are seriously concerned with their apparent eagerness to prevent eligible employes from receiving their approved payments in a timely fashion. [¶] We believe, and think most of you will agree, that after all of the lengthy legal processes which have preceded authorized payment, it is time to consider the wishes of each employe and not the political position of local union leaders and those who aspire to be leaders. It is difficult to understand why the President and Vice President of UAW Local #148 have consistently opposed the effort to settle this issue and now that a final decision is at hand their absolute refusal to cooperate in expediting payment. [¶] The payment to eligible employes is far more important than the political aspirations and personal ambitions of local union leaders who apparently are willing to sacrifice such payment so as to demonstrate 'union leadership.' "

The letter of April 23, 1974, states in pertinent part: "You may be assured that this company was the first company to agree with its major unions, including the UAW, as to how and what would be paid in a *general* agreement reached in May of 1973. It is, indeed, unfortunate that our employes have had to wait so long because of apparent self-interests of a few leaders within UAW Local 148. Apparently there were some internal politics within Local 148 and other areas of the UAW which certain individuals were using to seek personal gain and political prestige rather than to serve the best interests of the members they were supposed to represent. Hence, the delay in arriving at the final Supplemental Agreement."

Resolution of the major issue raised by defendants fully disposes of the case before us. This issue concerns the nature and scope of the remedy for allegedly defamatory statements published in the context of a labor controversy.

We note initially that libel actions for publications issued during labor disputes are not totally foreclosed by either state or federal law. Such publications do, however, receive special safeguards. California courts early extended constitutional protection to statements relating to labor disputes so long as they are not made maliciously. (*Emde* v. *San Joaquin County etc. Council* (1943) 23 Cal.2d 146, 154 [143 P.2d 20, 150 A.L.R. 916]; *Di Giorgio Fruit Corp.* v. *AFL-CIO* (1963) 215 Cal.App.2d 560, 568 [30 Cal.Rptr. 350].) The United States Supreme Court has acted in a similar vein. In *Linn* v. *Plant Guard Workers* (1966) 383 U.S. 53 [15 L.Ed.2d 582, 86 S.Ct. 657], the court applied the standard of *New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254 [11 L.Ed.2d 686, 84 S.Ct. 710, 95 A.L.R.2d 1412], formulated to protect statements made regarding public officials, to statements issued during labor controversies. This standard, requiring a determination of whether a statement was made "with knowledge that it was false or with reckless disregard of whether it was false or not" (*New York Times,* p. 280 [11 L.Ed.2d p. 706]), was adopted in the labor context not because the court felt the federal Constitution required it, but because of the policy of the Labor Management Relations Act (29 U.S.C. § 141 et seq.) in encouraging free debate on issues dividing labor and management. The court in *Linn* concluded that this policy could best be accommodated to the state's interest in protecting its citizens from malicious libels by adopting the *New York Times* standard. (*Linn,* p. 65 [15 L.Ed.2d p. 591]; see *Letter Carriers* v. *Austin* (1974) 418 U.S. 264, 270-273 [41 L.Ed.2d 745, 753-756, 94 S.Ct. 2770].) ■ The complaint before us fully satisfies this standard by properly alleging reckless and knowing falsehood.

An essential element of libel, and it is on this point that the complaint is fatally defective, is that the publication in question must contain a false statement of *fact.* ■ As expressed by the United States Supreme Court: "The *sine qua non* of recovery for defamation in a labor dispute under *Linn* is the existence of falsehood. . . . Before the test of reckless or knowing falsity can be met, there must be a false statement of fact." (*Letter Carriers* v. *Austin, supra,* 418 U.S. 264, at pp. 283-284 [41 L.Ed.2d 745, at p. 761], citation omitted.) This requirement, which is by no means limited to the labor dispute context, is constitutionally based. The reason for the rule, well stated by the high court, is that "Under the

First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." (*Gertz* v. *Robert Welch, Inc.* (1974) 418 U.S. 323, 339-340 [41 L.Ed.2d 789, 805, 94 S.Ct. 2997], fn. omitted; see also *In re Blaney* (1947) 30 Cal.2d 643, 649 [184 P.2d 892].) In this context courts apply the Constitution by carefully distinguishing between statements of opinion and fact, treating the one as constitutionally protected and imposing on the other civil liability for its abuse.

■ The critical determination of whether the allegedly defamatory statement constitutes fact or opinion is a question of law. (See *Letter Carriers, supra; Greenbelt Pub. Assn.* v. *Bresler* (1970) 398 U.S. 6 [26 L.Ed.2d 6, 90 S.Ct. 1537]; *Emde* v. *San Joaquin County etc. Council, supra,* 23 Cal.2d 146.) The distinction frequently is a difficult one, and what constitutes a statement of fact in one context may be treated as a statement of opinion in another, in light of the nature and content of the communication taken as a whole. ■ Thus, where potentially defamatory statements are published in a public debate, a heated labor dispute, or in another setting in which the audience may anticipate efforts by the parties to persuade others to their positions by use of epithets, fiery rhetoric or hyperbole, language which generally might be considered as statements of fact may well assume the character of statements of opinion.

Thus, in *Greenbelt Pub. Assn.* v. *Bresler, supra,* 398 U.S. 6, for example, the United States Supreme Court acknowledged that use of the word "blackmail" *could* in some circumstances constitute libel; it held, however, that its use as descriptive of plaintiff's negotiating position in the context of the particular circumstances involved in that case was not libelous. (Pp. 13-14 [26 L.Ed.2d pp. 14-15].) Similarly, in *Letter Carriers* v. *Austin, supra,* 418 U.S. 264, it was held that the publication of Jack London's definition of "scab," containing the phrase " '*traitor to his God, his country, his family and his class*' " and other words suggesting that plaintiffs had "rotten principles" and "lacked character," did not constitute libel. "Such words were obviously used . . . in a loose, figurative sense to demonstrate the union's strong disagreement with the views of those workers who oppose unionization. Expression of such an opinion, even in the most pejorative terms, is protected under federal labor law." (P. 284 [41 L.Ed.2d p. 762].) The high tribunal, reversing a state court injunction of union picketing, stated in *Cafeteria Union* v. *Angelos* (1943) 320 U.S. 293 [88 L.Ed. 58, 64 S.Ct. 126], that ". . . to use

loose language or undefined slogans that are part of the conventional give-and-take in our economic and political controversies—like 'unfair' or 'fascist'—is not to falsify facts." (P. 295 [88 L.Ed. p. 60].)

We, ourselves, have recognized that statements made in the context of a labor dispute which on their face resemble statements of fact, may, depending on the circumstances, be treated as statements of opinion not subject to an action for libel. In *Emde* v. *San Joaquin County etc. Council, supra,* 23 Cal.2d 146, we expressed the principle that ". . . since such [labor] disputes, realistically considered, normally involve considerable differences of opinion and vehement adherence to one side or the other, a necessarily broad area of discussion without civil responsibility in damages is an indispensable concomitant of the controversy." (Pp. 155-156.) Thus, we characterized as opinion, statements by a union that an employer had "hired" nonunion workers and put them on a "straight commission plan," that certain guarantees gained by the union had been "wiped out," that the status of employees "remained unchanged," and that the employer's labor policy was "destructive." (Pp. 157-159.)

We have held that language used by pickets in a labor dispute to the effect that an employer is "unfair to organized labor" was protected by the First Amendment because it was " '. . . part of the conventional give-and-take in our economic and political controversies . . .' " rather than a "falsification of facts." (*In re Blaney, supra,* 30 Cal.2d 643, at p. 649, citations omitted; see also *Park & T. I. Corp.* v. *Int. etc. of Teamsters* (1946) 27 Cal.2d 599, 613-614 [165 P.2d 891, 162 A.L.R. 1426].)

In a similar vein, a series of appellate decisions have characterized allegedly defamatory statements as fact or opinion in consideration of the particular circumstances in which the statements were made and with special attention to the probable expectancies of the audience to whom the statements were addressed. For example, in *Scott* v. *McDonnell Douglas Corp.* (1974) 37 Cal.App.3d 277 [112 Cal.Rptr. 609], the court concluded that it was not defamatory per se for a city councilman to charge that a city manager would " 'stoop to any form of action in . . . [his] power to . . . stay in office,' " that in a letter released to the press he " 'assume[d] the position of . . . City Dictator,' " that his administration of the city's affairs had descended to a " 'mutinous character,' " and that the people of Santa Monica are not so fortunate as to have " '. . . a City Manager who is dedicated to efficiently and honestly administer the affairs of the City for the people and through the people's elected representatives . . . .' " (Pp. 283-284.) Likewise, in *Taylor* v. *Lewis* (1933)

132 Cal.App. 381 [22 P.2d 569], the court found as opinion rather than fact statements that certain councilmen " 'did not consistently serve the best interest of the city,' " " 'usurped the functions of the city manager, dictated appointments in violation of the charter, and forced out of office useful employees of the city,' " " 'had as little respect for sound business usage in their conduct of city affairs as they showed for the charter and the merit system in municipal service,' " did not always " 'take the highest and best bids when selling, and the lowest and best when buying,' " and " 'lacked that conscientious regard for the city's interest which makes of public office a public trust'; . . ." (P. 385.)

 The gist of the statements before us is that the plaintiffs, union officers, were apparently willing to sacrifice the interests of the members of their union to further their own political aspirations and personal ambitions. The language of both statements is cautiously phrased in terms of apparency. More importantly, the charges are of the kind typically generated in the "economic give-and-take" of a spirited labor dispute in which the judgment, loyalties and subjective motives of rivals are reciprocally attacked and defended, frequently with considerable heat.

The charges in question are not of a factual nature nor are they of a type calculated to induce the audience, to whom they are addressed, to conclude or understand that they are factual. They may thus be distinguished from such cases as *Di Giorgio Fruit Corp.* v. *AFL-CIO, supra,* 215 Cal.App.2d 560, in which a publication issued in the context of a labor dispute was held to be a defamatory "falsification of facts" rather than a "bona fide [expression] of opinion." (P. 575.) The publication in *Di Giorgio* consisted of a film created and shown by a labor union as part of its efforts to organize farm laborers, which explicitly claimed to depict the housing, sanitation and medical conditions existing on a particular ranch. The scenes were actually filmed at another location.

Plaintiffs insist that both of the publications involved in this case impute to them motives of personal gain and political ambition. They contend that although statements of opinion regarding their abilities and judgment constitute protected First Amendment speech, attacks on their motivations are not so shielded. Plaintiffs stress the following language in *Eva* v. *Smith* (1928) 89 Cal.App. 324 [264 P. 803]: "This right, . . . [to criticize the conduct of public officers] does not warrant aspersive attack on the motives or character of the officer." (P. 328.)

The foregoing quoted expression was dictum, for the court held that the allegedly libelous statements at issue in that case were privileged public criticisms. Review by this court was not sought in *Eva*. More significantly, no published case since *Eva* has adopted its distinction between attacks on a public officer's character and motives, and attacks on his fitness for office. To the contrary, a recent appellate decision, *Scott v. McDonnell Douglas Corp., supra,* 37 Cal.App.3d 277, uses language which substantially limits this distinction: " '. . . [p]ublic journals, speakers, and private individuals may express opinions and indulge in criticism upon the *character* or habits, or mental or *moral qualifications* of official candidates.' " (P. 290, citation omitted, italics added.) *Scott* further cites with approval an early Massachusetts case, *Sillars v. Collier* (1890) 151 Mass. 50 [23 N.E. 723], which narrowly construes the significance of a statement allegedly accusing a plaintiff of improper motives. In *Sillars,* a statement that " 'sometimes the change of heart comes from the pocket' " was held not to impute corruption or bribery to plaintiff. (P. 724.)

■ Publications otherwise protected under the First Amendment do not lose their protection because they contain statements which attribute improper motives to a public officer or to an active participant in a labor dispute. The legal effect of attacks on motives must be carefully distinguished, however, from accusations that an individual has committed a crime or is personally dishonest. No First Amendment protection, of course, enfolds the latter charges. (See *Scott v. McDonnell Douglas Corp., supra,* 37 Cal.App.3d 277, at p. 289; *Howard v. Southern Cal. etc. Newspapers* (1950) 95 Cal.App.2d 580, 585 [213 P.2d 399]; *Taylor v. Lewis, supra,* 132 Cal.App. 381, at p. 386.)

■ The statements before us do not impute crimes or dishonesty to plaintiffs. Rather, they contain opinions that plaintiffs are not performing their duties competently and that they are not considering the best interests of the union membership. The assertions, including the references to plaintiffs' motives, relate directly to their fitness for the offices they held. As such, they constitute protected statements of opinion which are not properly the subject of a libel action.

The judgment sustaining the demurrer is affirmed.

Wright, C. J., McComb, J., Tobriner, J., Mosk, J., Sullivan, J., and Clark, J., concurred.