[No. B001324. Second Dist., Div. Five. Aug. 23, 1984.]

ROBERT F. O'CONNOR, Plaintiff and Appellant, v.
McGRAW-HILL, INC., et al., Defendants and Respondents.

COUNSEL

Richard J. Archer, Robert E. Schaberg, Archer, Rosenak & Hanson and David Brice Toy for Plaintiff and Appellant.

Paul, Hastings, Janofsky & Walker, Carl W. Shapiro, Laura Lindgren, Lynberg & Nelsen, Charles A. Lynberg and Timothy M. Thornton, Jr., for Defendants and Respondents.

**OPINION**

**HASTINGS, J.**—This is a complaint for (1) libel (first cause of action), (2) invasion of privacy (second cause of action), (3) slander (third cause of action) and (4) interference with economic advantage (fourth cause of action). The appeal is from a judgment entered after respondents' demurrers to appellant's complaint were sustained without leave to amend.

Plaintiff and appellant Robert F. O'Connor was formerly an attorney for the Eastman Kodak Company. Respondent Los Angeles Olympic Organizing Committee (LAOOC) is the organization responsible for hosting and conducting the 1984 Olympic Games in Los Angeles; respondent McGraw-Hill, Inc. is the publisher of Business Week magazine. This action arose as a result of an article published in Business Week's February 1, 1982 edition. The magazine contained a cover story entitled "KODAK FIGHTS BACK— Everybody wants a piece of its markets." Within the article was a "sidebar" which detailed how Kodak had lost out to Fuji Photo Film Company in Kodak's attempt to become an "official sponsor" of the 1984 Los Angeles Olympic Games.

The sidebar began as follows:

"To defeat the new competition it faces in conventional photography, Eastman Kodak Co. may have to change the image it projects to the world. Outsiders complain that the company still seems to believe it is the only alternative its customers have. That attitude apparently led to Kodak's loss to Fuji Photo Film Co. in December of official sponsorship of the 1984 Olympics."

It continued:

"The Los Angeles Olympic Organizing Committee (LAOOC) began talking to Kodak, its first choice, in January, 1980. 'The problem was, Kodak felt it could do what it pleased,' says Peter V. Ueberroth, the committee's president.

". . . . . . . . . . . . . . . . . . . . .

"The organizers had been trying to line up mostly U.S. sponsors, and the majority had come to agreements within three months. Kodak, however, spent 20 months haggling over the $4 million price and over standard contract language as well, says Ueberroth. At one point, a Kodak attorney picking over contract language declared, 'After all, this is Eastman Kodak,' recalls Daniel D. Greenwood, who is in charge of sponsorships for the LAOOC. 'It appeared to be a lack of enthusiasm, an arrogance.' "

O'Connor claims that he was the Kodak attorney referred to in the article, and that shortly after the article appeared he was fired from his job at Kodak. On December 30, 1982, he filed a complaint for damages asserting claims against McGraw-Hill for libel, invasion of privacy and interference with economic advantage, against the LAOOC for slander, invasion of privacy and interference with economic advantage, and against Kodak for wrongful discharge and intentional and negligent infliction of emotional distress. (The causes of action against Kodak were dismissed on the ground of inconvenient forum.)

In his complaint, O'Connor alleged that after several months of negotiations, he reached an agreement with counsel for the LAOOC on September 11, 1981. The agreement was to be signed by Kodak's vice president for advertising and returned by express mail along with Kodak's initial royalty check. O'Connor alleges that before Kodak could execute and return the final agreement and its royalty check to the LAOOC, the LAOOC contacted Kodak and denied the existence of the agreement. Approximately two months later, the LAOOC announced the award of a "Sponsor" license to Fuji Photo Film Company, Kodak's major competitor. According to O'Connor, the award was due to the fact that Fuji offered the LAOOC a substantially higher sum than it was to have received from Kodak.

O'Connor alleges that on January 19, 1982, a representative of the LAOOC sent to a Kodak executive a letter which read in part:

"Since our announcement of Fuji as our Official Sponsor, we have been contacted by various media personnel and business associates for comments regarding the negotiations leading to that decision. These questions have, of course, centered on the reasons for Eastman-Kodak not being involved.

"Our response has consistently been that we have always and continue to respect the management and the obvious professionalism of the Company. We have stated that Kodak was reluctant to commit to the minimum $4,000,000 level of a sponsorship and that despite a proposed alternative solution, negotiations continued for what we felt was too lengthy a period of time. At a certain point in these negotiations we felt a responsibility to talk with other potential sponsors. Fuji readily agreed to pay the required sponsorship amount. Contrary to other published reports, the cash amount paid was indeed no more than the figures discussed with Eastman-Kodak.

"We understand that an article may be published soon in *Business Week* which may attribute inaccurate quotes or opinions to spokespeople for this Committee. May I assure you personally and on behalf of the Los Angeles Olympic Organizing Committee that the article, if written as indicated, is

not an accurate reflection of our opinion of Eastman-Kodak or its management."

Less than two weeks later, the Business Week article appeared. Two weeks after that, O'Connor was fired from his job at Kodak.[1]

■ The court below sustained the demurrers of McGraw-Hill and the LAOOC on the ground that the statements made in the Business Week article constituted nondefamatory statements of opinion. We reverse.

■ For purposes of reviewing the court's action sustaining respondent's demurrers, the allegations of the complaint must be accepted as true. (*Serrano* v. *Priest* (1971) 5 Cal.3d 584, 591 [96 Cal.Rptr. 601, 487 P.2d 1241, A.L.R.3d 1187].) ■ Those allegations are that Kodak and the LAOOC *did* reach an agreement, negotiated by O'Connor, but before Kodak could return the signed agreement to the LAOOC along with its initial royalty check, the LAOOC denied the existence of the agreement. The clear implication of the article, however, is that negotiations broke off before any agreement could be reached, due primarily to the behavior of O'Connor. Such an implication impugns both the general and professional reputation of O'Connor.[2]

■ It is true that in the case of statements made in the context of public controversy, a political or public debate, a heated labor dispute or in another setting in which the audience may anticipate efforts by the parties to persuade others to their position by use of epithets, fiery rhetoric, et cetera, a court can determine as a question of law that the statements should be viewed in context and treated as an expression of opinion. (*Lewis* v. *Ueberroth* (1983) 147 Cal.App.3d 442 [195 Cal.Rptr. 150]; *Gregory* v. *McDonnell Douglas Corp.* (1976) 17 Cal.3d 596 [131 Cal.Rptr. 641, 552 P.2d 425]; *Okun* v. *Superior Court* (1981) 29 Cal.3d 442 [175 Cal.Rptr. 157, 629 P.2d 1369].) These cases and others of similar factual content were relied upon by respondents as points and authorities in their demurrers and were apparently persuasive with the trial court. ■ The statements in this case, however, were not made in such a setting. O'Connor is not a

---

[1]In his cause of action for wrongful termination against Kodak (dismissed on the ground of forum non conveniens), O'Connor alleged that he was fired despite the fact that his job performance had continually been rated outstanding. According to O'Connor, he was advised that he was being fired because he failed to "cover his tracks" and because he had become publicly "visible" with respect to the publicity over the loss of the Olympic Games sponsorship. He was also informed that he was the "whipping boy" for that publicity.

[2]O'Connor's name was not mentioned in the article, therefore he will have to establish at trial that the statements were slanderous and libelous and the listener or reader knew they applied to him. The allegations pertaining to damages that would flow from such knowledge provide for appropriate amendments when the true facts and amounts are known.

public figure, nor has he thrown himself into the midst of a public debate. Although the Olympic Games are worldwide in their importance, the statements made by defendants were not made in a setting in which the audience might necessarily consider the statements simply as an opinion.

The court erred in sustaining the general demurrers without leave to amend because a genuine issue of fact had to be determined. ■ The general rule is that the distinction between fact and opinion is a question of law, if the statement unambiguously constitutes either fact or opinion, but where, as here, the allegedly libelous remark or remarks could have been understood by the average listener or reader in either sense, the issue must be left to the jury's determination. (*Good Government Group of Seal Beach, Inc.* v. *Superior Court* (1978) 22 Cal.3d 672, 682 [150 Cal.Rptr. 258, 586 P.2d 572], citing *Mellen* v. *Times-Mirror Co.* (1914) 167 Cal. 587 [140 P. 277].)

In *Fairfield* v. *Hagan* (1967) 248 Cal.App.2d 194 [56 Cal.Rptr. 402], the court agreed that criticism of the manner in which an attorney conducted matters under his supervision could amount to defamation. In *Fairfield,* defendant had sent letters to creditors of a bankrupt estate. The letters contained the following statements:

" 'It is possible that many thousands of dollars are being wasted in useless attorney representations and other unnecessary expenses. We are aware some attorneys like to continue these matters for the purpose of their making a bigger fee.

" 'I suggest that you particularly check Mr. Fairfield who has apparently represented the estate to date and the amount he has received for services, much of which appear of a character that has accomplished nothing for the creditors and may have consumed much of the monies that have been received that should have gone to payment of the indebtedness due you and others. Should this be found true, then an attorney who has the best interest of the creditors in mind should be secured at once to replace Mr. Fairfield.

" ' . . . . . . . . . . . . . . . . . . . . .

" ' 'Also at the foreclosure of this trust deed by the trustees presumably handled by Mr. Fairfield, it appears a very serious mistake was made in only bidding at the sale $25,000, whereas the trust deed was $98,000. The result of this looks like the creditors have lost some $77,000 as no asset had been found to collect from since this amount has been taken in a defiency [*sic*] judgment personally against the purchasers and they have nothing. And as a defiency [*sic*] cannot again be returned as against the security

of the acreage, the entire amount appears to be lost to the creditors.' '' (248 Cal.App.2d at pp. 197-198, fn. 3.)

The court noted that from these statements the average reader could readily get the impression that Fairfield was "milking" the bankrupt estate, that he had charged and received fees to which he was not entitled because he had done little or no work, that Fairfield's acts and conduct in relation to the bankrupt estate were responsible for its impoverished condition, and that if Fairfield were permitted to continue as attorney for the bankrupt estate, the creditors would receive little or nothing. Such charges had a natural tendency to injure Fairfield's general reputation.

The court applied the following law in affirming the jury verdict for libel in favor of Fairfield against the writer of the letters. ■ The opinion states: "Libel per se is defined as 'A libel which is defamatory of the plaintiff without the necessity of explanatory matter, such as inducement, innuendo, or other extrinsic fact. . . .' (Civ. Code, § 45a.) 'A defendant is liable for what is insinuated, as well as for what is stated explicitly.' [Citation.] . . . 'The fact that an applied defamatory charge or insinuation leaves room for an innocent interpretation as well does not establish that the defamatory meaning does not appear from the language itself. The language used may give rise to conflicting inferences as to the meaning intended, but when it is addressed to the public at large, it is reasonable to assume that at least some of the readers will take it in its defamatory sense.' '' (*Id.* pp. 200-201.)

■ An essential element of libel is that the publication in question contain a false statement of fact. (*Gregory* v. *McDonnell Douglas Corp., supra,* 17 Cal.3d 596.) ■ The complaint in our present case clearly challenges the accuracy of the alleged slanderous and libelous statements. The statements made in the article are neither "clearly fact" nor "clearly opinion." In such a case the determination as to whether the article was defamatory must be left to the trier of fact. (*Good Government Group of Seal Beach, Inc.* v. *Superior Court, supra,* 22 Cal.3d 672.)

■ As to causes of action (2) invasion of privacy and (4) interference with economic advantage, they must also be reinstated in view of our reversal of causes of action (1) libel and (3) slander. (*Briscoe* v. *Reader's Digest Association, Inc.* (1971) 4 Cal.3d 529 [93 Cal.Rptr. 866, 483 P.2d 34, 57 A.L.R.3d 1]; *Scott* v. *McDonnell Douglas Corp.* (1974) 37 Cal.App.3d 277 [112 Cal.Rptr. 609].) They were dismissed by demurrer on the ground that the statements were constitutionally protected as opinion. Because this issue must be determined as a question of fact, the viability of these causes of action awaits further proceedings.

The judgment is reversed.

Stephens, Acting P. J., and Ashby, J., concurred.

Petitions for a rehearing were denied September 14, 1984.