**Jose SOLANO, Jr., Plaintiff–Appellant,**

**v.**

**PLAYGIRL, INC., Defendant–Appellee.**

**No. 01–55443.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 4, 2002.

Filed June 13, 2002.

---

Jonathan H. Anschell, White O'Connor Curry Gatti & Avanzado, Los Angeles, CA, for plaintiff-appellant.

Kent R. Raygor, Sheppard, Mullin, Richter & Hampton, Los Angeles, CA, for defendant-appellee.

Before: PREGERSON, FISHER and TALLMAN, Circuit Judges.

FISHER, Circuit Judge.

The January 1999 issue of Playgirl magazine featured a cover photograph of actor Jose Solano, Jr., best known for his role as "Manny Gutierrez" on the syndicated television program "Baywatch" from 1996 to 1999. Solano was shown shirtless and wearing his red lifeguard trunks, the uniform of his "Baywatch" character, under a heading reading: "TV Guys. PRIME-TIME'S SEXY YOUNG STARS EXPOSED." Playgirl, ostensibly focused on a female readership, typically contains nude photographs of men in various poses emphasizing their genitalia, including some showing them engaged in simulated sex acts. The magazine also contains written editorial features. Although Solano—who did not pose for or give an interview to Playgirl—did not in fact appear nude in the magazine, he sued Playgirl alleging it deliberately created the false impression

that he did so, making it appear he was willing to degrade himself and endorse such a magazine.

The district court granted Playgirl summary judgment, finding Solano had failed to establish that Playgirl created a false impression about what readers would actually see of Solano inside the magazine or in any event that it had acted knowingly or recklessly in doing so. We disagree and reverse for a trial. At this stage of the proceedings, viewing the evidence most favorably to Solano as we must on summary judgment, we hold that he provided sufficient evidence to create triable issues of fact for the jury on the elements of each of his causes of action.

## FACTS AND PROCEDURAL HISTORY

Because this case concerns the magazine cover, we describe it in some detail and append a copy of it to this opinion. (Addendum A.) As indicated above, Solano appeared bare-chested wearing his red trunks, dominating the cover. In the upper left corner was a red circle containing the words, "TV Guys," followed by the headline, "Primetime's Sexy Young Stars Exposed," which ran across the top of Solano's head. Immediately to the left of Solano's picture, the magazine proclaimed, "12 Sizzling Centerfolds Ready to Score With You." The "s" in "Centerfolds" was superimposed on Solano's right shoulder. Also placed to the left of Solano, running down the left margin, the cover touted "Countdown to Climax: Naughty Ways to Ring in the New Year," "Toyz in the Hood: The Best in Erotic Home Shopping" and "Bottoms Up!: Hot Celebrity Buns." In the cover's lower right hand corner was the headline, "Baywatch's Best Body, Jose Solano."

Solano's sole appearance inside the magazine was on page 21, in a quarter-page, head-and-shoulders photograph—showing him fully dressed in a tee shirt and sweater—alongside a brief, quarter-page profile of the actor. Solano's profile included information about his "Baywatch" character, facts about his life before he began acting and a quote in which he says that with two younger brothers he strives to be a positive role model and hopes to encourage others to pursue their dreams. Solano's photograph and profile were part of a five-page feature entitled "TV Guys," consisting of photographs and short profiles of 10 popular television actors. Neither Solano nor any of the other actors was shown nude. Significantly, Playgirl issues are displayed on newsstands packaged in plastic wrap to prevent potential customers from flipping through the pages to view the magazine's contents.

This action began when Solano filed suit against the magazine's publisher, Playgirl, Inc., in California Superior Court, alleging Playgirl invaded his privacy by portraying him in a false light and by misappropriating his likeness in violation of California Civil Code § 3344 and common law. He claimed he was humiliated and embarrassed when he learned of the use of his photograph on the cover of Playgirl and that he suffered a decline in job offers, invitations to charity events and social contacts with others in the entertainment industry following the publication of the January 1999 issue.[1] After Playgirl removed the case to federal court, the district court granted Playgirl's motion for summary judgment. The court found that the use of Solano's photograph in Playgirl did not create a false impression and, in any event, as a public figure he could not show actual

---

1. As recently as January 2001, Playgirl continued to sell the January 1999 issue as a back issue for order from the magazine.

malice; that the public affairs exception defeated his § 3344 claim; and that the public interest exception defeated his common law misappropriation of likeness claim. The court also awarded attorney's fees and costs to Playgirl. Solano timely appealed.

We review a grant of summary judgment de novo. *Weiner v. San Diego County,* 210 F.3d 1025, 1028 (9th Cir.2000). We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether any genuine issues of material fact exist and whether the district court applied the relevant substantive law. *Lopez v. Smith,* 203 F.3d 1122, 1131 (9th Cir.2000) (en banc).

### DISCUSSION

### I. The False Light Claim

■ Solano argues that Playgirl's use of his photograph along with suggestive headlines on the cover conveyed the false message that Solano voluntarily posed nude for the magazine and, in doing so, implicitly endorsed the magazine and its sexually explicit content. To prevail on this false light claim, Solano must show that: (1) Playgirl disclosed to one or more persons information about or concerning Solano that was presented as factual but that was actually false or created a false impression about him; (2) the information was understood by one or more persons to whom it was disclosed as stating or implying something highly offensive that would have a tendency to injure Solano's reputation; (3) by clear and convincing evidence, Playgirl acted with constitutional malice; and (4) Solano was damaged by the disclosure. *See Fellows v. Nat'l Enquirer, Inc.,* 42 Cal.3d 234, 228 Cal.Rptr. 215, 721 P.2d 97, 99–101 (1986); *Aisenson v. Am. Broad. Co., Inc.,* 220 Cal.App.3d 146, 269 Cal.Rptr. 379, 387 (1990); *see also* Restatement (Second) of Torts § 652E (1976) (discussing elements of false light claim).

### A. False Impression and Injury to Reputation

■ Solano contends that when the photograph and headlines on the cover are viewed in context—that of a magazine that features sexually suggestive nude pictures of men-there is a triable issue of fact regarding the falsity of the message conveyed by Playgirl. We agree. We addressed a publication's creating an implied false message in *Eastwood v. Nat'l Enquirer, Inc.,* 123 F.3d 1249 (9th Cir.1997), and *Kaelin v. Globe Communications Corp.,* 162 F.3d 1036 (9th Cir.1998). In *Eastwood* the tabloid magazine National Enquirer's cover page headline advertised an "Exclusive Interview" with actor/director Clint Eastwood. The magazine contained an article with quotes allegedly attributable to Eastwood, cast as if Eastwood had been speaking directly to the bylined Enquirer editor. *See Eastwood,* 123 F.3d at 1250. Eastwood in fact had never given any interview to the Enquirer—exclusive or otherwise. Although the magazine never expressly stated that Eastwood actually had given it the interview, this court nevertheless reasoned that the Enquirer had "signal[ed], through text and graphics, that he had willingly talked to the Enquirer." *Id.* at 1255. *Kaelin* involved a defamation action brought by Kato Kaelin, the hapless houseguest of O.J. Simpson, against the Globe tabloid for publishing a front-page headline announcing, "COPS THINK KATO DID IT . . . he fears they want him for perjury, say pals." Kaelin argued the "IT" implied the two brutal murders for which Simpson was tried and acquitted; the magazine claimed the word referred only to perjury, because the article inside the magazine explained that the police suspected Kaelin of having committed perjury. We were unpersuaded by the Globe's argument: "Even assuming that such a [perjury] reading is reasonably possible, it is not the only read-

ing that is reasonably possible as a matter of law. So long as the publication is reasonably susceptible of a defamatory meaning, a factual question for the jury exists." *Kaelin,* 162 F.3d at 1040.[2]

Playgirl's reliance on *Brewer v. Hustler Magazine, Inc.,* 749 F.2d 527 (9th Cir. 1984), is misplaced. In *Brewer,* the plaintiff brought suit when Hustler magazine reproduced a portion of a previously published postcard depicting Brewer shooting himself in the head. Brewer himself had created the postcard and contracted to sell it commercially. We rejected Brewer's argument that his right to privacy was violated by publication of the photograph in a sexually explicit magazine, holding that "[t]his argument is without merit because Brewer had no right to choose the forum in which his photograph was displayed." *Id.* at 530. Similarly, Solano cannot prevail on his false light claim simply by arguing that Playgirl put him on the cover of a magazine that contains explicit content. Indeed, that was the basis of Brewer's claim—that a reproduction of a portion of his *nonsexual* postcard appeared *inside* a sexually explicit magazine.

Unlike *Brewer,* Solano's claim goes much deeper. Solano contends that his bare-chested, three-quarter-length photograph alongside the suggestive headlines on the Playgirl cover created the false impression that readers could expect to find more photographs of him inside the magazine, nude—"exposed"—in Playgirl's typical sexually explicit and revealing mode of depicting its "sexy" male subjects. Moreover, the placement of the "12 Sizzling Centerfolds—Ready to Score With

You" line, which appeared in large bold letters immediately to the left of and just touching Solano's shoulder, could reasonably be interpreted to encompass Playgirl's cover subject, Solano. It is well-established that "[a] defendant is liable for what is insinuated as well as for what is stated explicitly." *O'Connor v. McGraw-Hill,* 159 Cal.App.3d 478, 206 Cal.Rptr. 33, 36 (1984) (quotation omitted). It is Playgirl's insinuation about what readers would see of Solano inside the magazine that distinguishes this case from *Brewer.* As the Seventh Circuit observed in *Douglass v. Hustler Magazine,* 769 F.2d 1128 (7th Cir.1985), where an actress asserted a false light claim based on Hustler magazine's insinuation that she was the kind of person to pose nude for Hustler: "To be depicted as *voluntarily* associated with such a sheet . . . is unquestionably degrading to a normal person. . . ." *Id.* at 1136.

■ That Solano's profile inside the magazine was of a relatively innocent and nonsexual nature is of little significance.[3] In *Kaelin,* we concluded that the accuracy and truth of the Globe article discussing the suspicion that Kaelin had perjured himself did not cure the false impression conveyed by the cover headline, which implied he was suspected of murder. 162 F.3d at 1041. We held that the issue was one for the jury to decide: "A reasonable juror could conclude that the Kaelin article was too far removed [17 pages away] from the cover headline to have the salutary effect that Globe claims." *Id.* Here, the Solano profile appeared 21 pages away from the cover—with plenty of graphic

---

2. Although *Kaelin* involved defamation rather than false light, it nonetheless is applicable in this context. "An action for invasion of privacy by placing the plaintiff in a false light in the public eye is in substance equivalent to a libel claim." *Selleck v. Globe Int'l,* 166 Cal. App.3d 1123, 212 Cal.Rptr. 838, 845 (1985) (citation omitted).

3. Solano's profile included some mild titillating prose: "luscious Latino"; "Jose didn't always spend his days frolicking on the beach with fake-boobed babes"; and "versatile stud."

frontal male nudity to traverse before reaching "TV Guys" and Solano's tame profile.[4] "[O]ur inquiry is not to determine whether the publication may have an innocent meaning but rather to determine if it reasonably conveys a defamatory meaning. In making that determination we look to what is explicitly stated as well as what insinuation and implication can reasonably be drawn from the publication." *Selleck v. Globe Int'l,* 166 Cal.App.3d 1123, 212 Cal.Rptr. 838, 843 (1985) (citation omitted). Given the record before us—especially when we recall that the magazine is displayed for sale in plastic wrapping, making the cover the key to what a reader can expect to find inside the magazine—a jury reasonably could reach a conclusion similar to that arrived at by this court in *Eastwood:*

> [W]e look to the totality of the Enquirer's presentation of the interview and find that the editors falsely suggested to the ordinary reader of their publication—as well as those who merely glance at the headlines while waiting at the supermarket checkout counter—that Eastwood had willingly chatted with someone from the *Enquirer.*

123 F.3d at 1256. There we concluded that the false impression that Eastwood had actually given an interview with the Enquirer could convey the message that he was "washed up as a movie star if he was courting publicity in a sensationalist tabloid." *Id.* Similarly, a jury reasonably could conclude that the Playgirl cover conveyed the message that Solano was not the wholesome person he claimed to be, that he was willing to—or was "washed up" and had to—sell himself naked to a women's sex magazine.

**B. Actual Malice**

■ Although Solano has established a genuine issue as to whether the cover created a false impression, to survive summary judgment he must, as a public figure, also establish by clear and convincing evidence that Playgirl's editors knowingly or recklessly created this false impression. The third element necessary to establish a claim for false light, therefore, is the constitutional requirement of actual malice. *See Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 686, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989) (quoting *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 511, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984)); *Aisenson,* 269 Cal.Rptr. at 382–83. A failure to set forth specific facts showing such malice is a proper ground for summary judgment. *See Dworkin v. Hustler Magazine, Inc.,* 867 F.2d 1188, 1195 (9th Cir.1989). Specifically, Solano must show that Playgirl "either deliberately cast [its] statements in an equivocal fashion in the hope of insinuating a [false] import to the reader, or that [it] knew or acted in reckless disregard of whether [its] words would be interpreted by the average reader as[false] statements of fact." *Good Gov't Group of Seal Beach, Inc. v. Superior Court,* 22 Cal.3d 672, 150 Cal.Rptr. 258, 586 P.2d 572, 578 (1978). As we noted in *Eastwood,* proving actual malice by clear and convincing evidence is a heavy burden, "far in excess of the preponderance sufficient for most civil litigation." 123 F.3d at 1252. In *Harte–Hanks,* the Supreme Court explained the actual malice standard:

> [T]he actual malice standard is not satisfied merely through a showing of ill will or 'malice' in the ordinary sense of the term.... Nor can the fact that the de-

---

**4.** The terrain is even more extensive and graphic for those who read their magazines back to front.

fendant published the defamatory material in order to increase its profits suffice to prove actual malice. ... Actual malice, instead, requires at a minimum that the statements were made with a reckless disregard for the truth. And although the concept of 'reckless disregard' 'cannot be fully encompassed in one infallible definition,' we have made clear that the defendant must have made the false publication with a 'high degree of awareness of ... probable falsity,' or must have 'entertained serious doubts as to the truth of his publication.'

491 U.S. at 666–67, 109 S.Ct. 2678 (citations and footnote omitted). Similarly, the California Court of Appeal has emphasized:

'[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.'

*Aisenson,* 269 Cal.Rptr. at 386 (citation omitted).

 "The subjective determination of whether [the defendant] in fact entertained serious doubts as to the truth of the statement may be proved by inference, as it would be rare for a defendant to admit such doubts. A court typically will infer actual malice from objective facts. These facts should provide evidence of negligence, motive, and intent such that an accumulation of the evidence and appropriate inferences supports the existence of actual malice." *Bose Corp. v. Consumers*

*Union,* 692 F.2d 189, 196 (1st Cir.1982) (citations omitted).

Against this backdrop, we now turn to the conflicting evidence regarding the existence of actual malice on the part of Playgirl editors in assembling the January 1999 issue. Playgirl associate editor Theresa O'Rourke testified in her deposition that at an October 1998 meeting to discuss the January 1999 cover, Playgirl senior vice president Carmine Bellucci generally instructed the editorial staff to "sex up" the magazine to imply that there was more nudity in the magazine than actually was there.[5] She stated that Bellucci wanted to "bang [readers] over the head with something like, hey, this is sexy young stars exposed" so that "people are going to want to pick up the magazine more." According to O'Rourke, "we definitely weren't trying to be subtle, and we knew it." She stated that there had been discussion in the cover meetings that the cover layout implied Solano appeared nude in a centerfold inside the magazine. She said the "Primetime's Sexy Young Stars Exposed" headline specifically sparked debate at the meetings "[b]ecause some of us did not feel like it was fair to do that." Editor-in-chief Claire Viguerie Harth testified that the magazine's intent with the headline was "to make a line that was sexy enough [that] people would be intrigued and want to look inside, but not to say something that the magazine was showing something that it didn't have."

Playgirl art director Joanne Chiaramonte emphasized that if the magazine had contained a nude photograph of Solano, the cover explicitly would have said so. She stated that she never thought readers would expect to see Solano in a centerfold photograph because the headline, "Bay-

---

5. Playgirl claims that O'Rourke was a low-level editor without any decision-making authority. We note, however, that O'Rourke appears third from the top, under only the editor-in-chief and managing editor, in the masthead for the January 1999 issue.

watch's Best Body, Jose Solano" clearly referred to Solano's presence in the magazine. *But see Eastwood,* 123 F.3d at 1256 (concluding that readers would not understand that only "*Enquirer* Interview," not "Exclusive Interview," would mean interview was given directly to Enquirer). Additionally, she explained that "[e]xposed and nude are really two different things." Associate art director Serena Spiezio disagreed.[6] She testified that she thought it would be reasonable for a reader to expect to see Solano nude inside the magazine "[b]ecause it says TV Guys and they're being exposed. And it's Playgirl Magazine. What else would they be exposing but their bodies?"

O'Rourke also recalled that someone raised a concern about the "12 Sizzling Centerfolds: Ready to Score with You" headline because it occupied the space where the headline relating to the cover subject often is placed. She believed "someone's going to think that he's naked in there." O'Rourke said that Bellucci tended to just "blow off" such comments and concerns. Bellucci agreed in his deposition that Solano was a "primetime sexy young star" as those words were used in the cover headline, but denied that the editors used Solano's photograph and the cover headlines falsely to imply that Solano appeared nude in the magazine.

Even if, as Playgirl asserts, Chiaramonte and Bellucci were the final decisionmakers as to the content of the cover, the testimony of O'Rourke and Spiezio serve to prove that during the editorial process *someone* raised concerns about the use of Solano's photograph alongside the suggestive headlines; both Bellucci and Chiaramonte were aware of some staffers' concerns that the cover might falsely imply that Solano appeared nude inside the mag-

azine. Given that awareness and the evidence that Bellucci wanted to "sex up" the magazine to imply nudity, plainly to promote magazine sales, a jury could conclude Playgirl's editors knowingly or recklessly published the misleading cover. Such evidence is sufficient to satisfy the actual malice standard. *See Kaelin,* 162 F.3d at 1042 (holding actual malice inferable from editor's mild concern about ambiguous headline, undisputed absence of belief that Kaelin was a murder suspect and pecuniary motive to sell papers); *Eastwood,* 123 F.3d at 1256 (finding from totality of editors' choices that they intended to convey impression, known to be false, that Eastwood wilfully submitted to interview by Enquirer).

This case is unlike *Hoffman v. Capital Cities/ABC, Inc.,* 255 F.3d 1180 (9th Cir. 2001). There, actor Dustin Hoffman brought a misappropriation claim when a magazine featured Hoffman and other celebrities, many of whom were then deceased, in digitally altered photographs depicting scenes from famous movies. Hoffman objected to the use of an altered still photograph of himself from the movie "Tootsie" in a layout featuring the year's spring fashions. The wellknown picture of Hoffman had been altered to show him modeling new designer clothing. We held that the magazine had not acted with malice because "[a]ll but one of the references to the article in the magazine make it clear that digital techniques were used to substitute current fashions for the clothes worn in the original stills...." *Id.* at 1188. Further, we concluded that "[w]hile [the magazine] never explicitly told its readers that the living actors did not pose for the altered photographs in the article, there is certainly no clear evi-

---

**6.** According to Playgirl, Spiezio worked for the magazine for only three and a half months before she was fired.

dence in the magazine that [the magazine] intended to suggest the opposite ...." *Id.* Here the evidence suggests Playgirl may have knowingly or recklessly used its cover to mislead readers about Solano's true state of dress in the magazine.

*Cher v. Forum Int'l, Ltd.*, 692 F.2d 634 (9th Cir.1982), does not assist Playgirl either. There entertainer Cher gave an interview to a freelance reporter with the understanding that it would be used in a specific magazine, Us. Cher later asked Us not to use the story and the reporter then sold the story to Star, a tabloid, and Forum, a pocket-sized magazine, both of which ran the interview as an "exclusive." Cher argued that the publication of the interview and the "exclusive" headlines on the covers created the impression that she voluntarily gave the interviews to, and thereby endorsed, Star and Forum. We granted judgment in favor of Star because its headlines truthfully conveyed the contents of its magazine. *Id.* at 637–38. On the other hand, we affirmed liability as to Forum because it went beyond the "honest exploitation of the fact that it possessed some pictures of Cher and an interview that she had given a writer," instead falsely advertising in a subscription "tear out" that Cher told Forum "things that she 'would never tell Us' "—which, of course, Cher had told Us originally. *Id.* at 639. As we emphasized, "no matter how carefully the editorial staff of Forum may have trod the border between the actionable and the protected, the advertising staff engaged in the kind of knowing falsity that strips away the protection of the First Amendment." *Id.* at 640. Whether that barrier was crossed here is for the jury to decide.

It is neither surprising nor fatal to Solano's case that there is conflicting, circumstantial evidence that Playgirl entertained serious doubt whether the magazine cover would create the false impression that So-

lano appeared nude inside the magazine. "As we have yet to see a defendant who admits to entertaining serious subjective doubt about the authenticity of an article it published, we must be guided by circumstantial evidence. By examining the editors' actions we try to understand their motives." *Eastwood*, 123 F.3d at 1253. *See Kaelin*, 162 F.3d at 1042 ("The editors' statements of their subjective intention are matters of credibility for a jury."); *cf. Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coalition of Life Activists*, 290 F.3d 1058, 1068–71 (9th Cir.2002) (en banc) (discussing deference accorded credibility determinations in court's postjudgment independent assessment of actual malice); *Eastwood*, 123 F.3d at 1252 (same). Viewing the evidence in the light most favorable to Solano and taking into account the typical Playgirl content, we believe Solano at this stage of the proceedings raises a genuine issue as to whether Playgirl's editorial staff produced the January 1999 cover knowing, or with reckless disregard for whether, Solano's bare-chested photograph and various suggestive headlines would falsely imply that he voluntarily posed for and appeared nude inside the magazine.

### C. Damages

The final element necessary to prove a case for false light is damages. A plaintiff may collect actual damages and general damages for humiliation and mental anguish and suffering. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). Playgirl argues that Solano cannot prove any damages. Solano admitted in his deposition that he did not seek therapy or any other type of treatment from any medical professional, although he did seek spiritual counseling from his father, a minister. He testified to both personal and familial humiliation and embarrassment because of

the publication of his picture in the magazine. He claimed that several possibilities for appearing on various television programs failed to materialize after the publication of the Playgirl issue, yet he was unable to provide evidence that any lost job was related to his appearance in the magazine. Solano's current and previous agent and previous manager all stated that no one ever has mentioned the Playgirl issue to them—especially in relation to a job for Solano. Solano also argues that his invitations to charity events declined after the publication of the Playgirl issue, but again he admitted that he could only speculate—and had no proof—that there is a connection between the two events.

■ In *Eastwood,* we rejected the contention that the jury's award of $150,000 was unsupported by a record that detailed Eastwood's extensive efforts to maintain his privacy. 123 F.3d at 1256. There we held that a jury finding that "fans would think him (1) a hypocrite for giving the Enquirer an 'exclusive interview' about his private life (plus access to an 'exclusive' baby picture), and/or (2) essentially washed up as a movie star if he was courting publicity in a sensationalist tabloid ... would have been sufficiently damaging to Eastwood's reputation to support an award of this magnitude." *Id.* Previously, we concluded that a jury's award of $75,000 in compensatory damages to singer Tom Waits was sufficiently supported where "the jury could have inferred from the evidence that the commercial created a public impression that Waits was a hypocrite for endorsing Doritos." *Waits v. Frito–Lay, Inc.,* 978 F.2d 1093, 1104 (9th Cir. 1992). Waits had a strict policy against doing commercials and the company produced a commercial using an imitation of Waits' voice. Similarly, comedienne Carol Burnett's testimony of personal and familial humiliation and embarrassment resulting from a false National Enquirer gossip column item which portrayed her as drunk, combined with her public image (which included her endeavors to raise awareness about alcoholism) and the tabloid's sizeable readership, was enough to support a damage award of $50,000. *Burnett v. Nat'l Enquirer, Inc.,* 144 Cal. App.3d 991, 193 Cal.Rptr. 206, 222 (1983). In light of this precedent, Solano's testimony regarding his humiliation and embarrassment is sufficient to establish a genuine issue with respect to damages and precludes summary judgment. (We make no predictions about whether this evidence alone will suffice to sustain the damages element at trial.)

## II. The Misappropriation Claims

■ Solano alleges statutory misappropriation of his right of privacy under California Civil Code § 3344 as well as common law commercial misappropriation invasion of privacy. Under § 3344(a), a plaintiff has a cause of action when "any person ... knowingly uses another's name, voice, signature, photograph, or likeness, in any manner, on or in products, merchandise, or goods ... without such person's prior consent ...." The statute also provides protection for certain uses, however, such that "a use of a name, voice, signature, photograph, or likeness in connection with any news, public affairs, or sports broadcast or account, or any political campaign, shall not constitute a use for which consent is required under subdivision (a)." Cal. Civ.Code § 3344(d) (1997). To prove a claim of common law commercial misappropriation of privacy, a plaintiff must establish the defendant's use of plaintiff's identity, the appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise, a lack of consent and resulting injury. *See Downing v. Abercrombie & Fitch,* 265 F.3d 994, 1001 (9th Cir.2001). Similar to

the statutory public affairs protection, the common law misappropriation cause of action also recognizes a public interest protection. *See Dora v. Frontline Video, Inc.,* 15 Cal.App.4th 536, 18 Cal.Rptr.2d 790, 794–95 (1993).

 The district court found that the public affairs/public interest newsworthiness protections exempted Playgirl from liability for using the photographs of Solano and thereby granted summary judgment for Playgirl on these claims. Even though the exceptions are to be broadly construed, the newsworthiness privileges do not apply where a defendant uses a plaintiff's name and likeness in a knowingly false manner to increase sales of the publication. The First Amendment does not protect knowingly false speech. *New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). "[W]e do not believe that the Legislature intended to provide an exemption from liability for a knowing or reckless falsehood under the canopy of 'news.' We therefore hold that Civil Code section 3344, subdivision (d), as it pertains to news, does not provide an exemption for a knowing or reckless falsehood." *Eastwood v. Superior Court,* 149 Cal.App.3d 409, 198 Cal.Rptr. 342, 352 (1983).[7] As discussed

above, we believe Solano has established a genuine issue regarding whether Playgirl acted with actual malice in using Solano's photograph on the cover of the magazine. Therefore, it was premature for the district court to address the applicability of the newsworthiness exceptions to Solano's claims, and summary judgment was inappropriate.[8]

 Playgirl argues that summary judgment nevertheless was appropriate because Solano cannot prove the elements of lack of consent and damages for his misappropriation causes of action. We think otherwise. There is enough disputed evidence to require a jury resolution. As to consent, Playgirl purchased Solano's cover photograph from Retna, Ltd., a photograph stock house; the sale invoice for the photograph included language stating that Solano had not executed a release for the use of the image. Additionally, Solano testified in his deposition that his representatives previously had been approached by Playgirl to do a "spread" in the magazine and he had immediately declined the offer. On the other hand, Playgirl argues that Solano voluntarily posed for the photographer to garner free publicity and knew that the photographs would be sold to magazines for publication.

---

7. When *Eastwood v. Superior Court* was decided in 1983, section 3344 applied only to an unauthorized use "for purposes of advertising products, merchandise, goods or services, or for purposes of solicitation of products ...." A 1984 amendment to section 3344 eliminated the requirement that the misappropriation must occur in a product advertisement, endorsement or solicitation. *See KNB Enter. v. Matthews,* 78 Cal.App.4th 362, 92 Cal.Rptr.2d 713, 717 n. 5 (2000) (discussing amendment to section 3344).

8. We do not accept Solano's argument that Playgirl is not a news magazine and thus cannot contain content that may be deemed

newsworthy. "[E]ven 'vulgar' publications are entitled to such guarantees.... Courts are, and should be, reluctant to define newsworthiness." *Lerman v. Flynt Distrib. Co., Inc.,* 745 F.2d 123, 138–39 (2d Cir.1984). "[N]ewsworthiness is not limited to 'news' in the narrow sense of reports of current events. It extends also to the use of names, likenesses or facts in giving information to the public for purposes of education, amusement or enlightenment, when the public may reasonably be expected to have a legitimate interest in what is published." *Shulman v. Group W Prod., Inc.,* 18 Cal.4th 200, 74 Cal.Rptr.2d 843, 955 P.2d 469, 483 (1998) (citations and internal quotation marks omitted).

■ As for damages, the measure of damages available for misappropriation claims includes the economic value of the use of an individual's name and likeness. *See Zacchini v. Scripps–Howard Broad. Co.*, 433 U.S. 562, 575, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977). Section 3344 specifically provides that a plaintiff may recover "any profits from the unauthorized use" in addition to actual damages or the $750 minimum statutory damage amount and punitive damages. Cal. Civ.Code § 3344(a) (1997). Solano has established genuine issues with respect to both of these elements.

## CONCLUSION

For the reasons stated, we reverse the district court's grant of summary judgment to Playgirl and remand for further proceedings.

REVERSED and REMANDED.

## ADDENDUM A