76 Cal.Rptr.3d 292 (2008)
162 Cal.App.4th 737
SIMPSON STRONG-TIE COMPANY, INC., Plaintiff and Appellant,
v.
Pierce GORE et al., Defendants and Respondents.
No. H030444.
Court of Appeal of California, Sixth District.
April 30, 2008.
*295 Arthur J. Shartsis, Erick C. Howard, San Francisco, Eisenberg and Hancock, Jon B. Eisenberg, Oakland, William N. Hancock, San Francisco, for Plaintiff and Appellant, Shartsis Friese Simpson Strong-Tie Company, Inc.
Davis Wright Tremaine, Thomas R. Burke, Rochelle L. Wilcox, Los Angeles, for Defendants and Respondents, Pierce Gore et al.
Arkin & Glovsky, Sharon Arkin, Pasadena, for Amicus Curiae Consumer Attorneys for California.
Levy, Ram & Olson, Karl Olson, San Francisco, for Amicus Curiae Senator Sheila Kuehl et al.
RUSHING, P.J.
An attorney published a newspaper advertisement stating that users of certain brand name galvanized screws under specified circumstances "may" have legal rights to compensation or other relief. The manufacturer of one of the named brands brought this action for defamation, trade libel, false advertising, and unfair business practices. We are called upon to decide: (1) Is this a strategic lawsuit against public participation (SLAPP) so as to be subject to summary disposition under the anti-SLAPP law? (2) Is it exempt from that law as a statement "about" the attorney's services, or one made in the course of delivering those services? (3) If it is not exempt, has the manufacturer established that it is likely to prevail on the merits, so as to avoid dismissal?
The trial court answered these questions yes, no, and no, respectively. We find no error in these rulings, and will therefore affirm. In a companion appeal, we affirm the associated award of attorney fees to the defendant attorney.

BACKGROUND
In January 2006, defendant Pierce Gore caused an advertisement to appear in the San Jose Mercury News and Los Gatos Weekly Times in substantially the following form:[1]
*296
 ATTENTION:
 WOOD DECK OWNERS
If your deck was built after January 1, 2004 with
galvanized screws manufactured by Phillips Fastener
Products, Simpson Strong Tie or Grip Rite, you may
have certain legal rights and be entitled to monetary
compensation, and repair or replacement of your deck.
Please call if you would like an attorney to investigate
whether you have a potential claim:
 Pierce Gore
 GORE LAW FIRM
 900 East Hamilton Ave.
 Suite 100 Campbell, CA 95008
 XXX-XXX-XXXX
On February 7, 2006, plaintiff Simpson Strong-Tie Co., Inc. (Simpson), filed this action, asserting causes of action against Gore and his firm for defamation, trade libel, false advertising, and unfair business practices. Simpson alleged that Gore's advertisement was false "in that it communicates that Simpson's galvanized screws are defective."[2] Simpson admitted, however, that there were risks in using some of its products with the "pressure-treated wood" that "is commonly used in outdoor decks...." According to a Simpson web page included in the record, "Pressure treatment is a process that forces chemical preservatives into the wood."[3] Simpson alleged in its complaint that wood so treated "can have a corrosive effect on steel products, including galvanized screws, that potentially shortens their service life and compromises their ability to support their recommended loads or endure seismic and environmental stresses." These risks had been magnified by the treated wood industry's abandonment, effective December 31, 2003, of the preservatives formerly used in favor of "chemicals that are considered safer for human contact, but more corrosive to galvanized steel products." Simpson alleged, "The amount of corrosion that can occur when Simpson's screws are used in combination with pressure-treated *297 wood varies depending on the type of metal screw and coating used, the type and amount of chemicals used in pressure treatment, the design and location of the deck, arid numerous environmental conditions. Because different metals and different coatings resist corrosion at different rates, the selection of metal type or coating should vary depending on the conditions and circumstances in which the products will be used. All of these factors are beyond Simpson's control. Simpson has no way of knowing which of these many variables will be present when its parts are used."
Gore moved to strike the complaint under Code of Civil Procedure section 425.16 (§ 425.16). He argued that Simpson's causes of action arose from his exercise of speech rights and were thus subject to summary disposition under the statute. He contended that Simpson could not establish the probability of success necessary to survive such a motion (see § 425.16, subd. (b)(1)), because (1) all of its claims were barred by the privilege for communications in a judicial proceeding (Code Civ. Proc, § 47, subd. (b)); (2) Simpson could not show that the advertisement contained a false statement; and (3) Simpson could not show that Gore published the advertisement with knowledge of falsity or reckless disregard for the truth.
Gore supported his motion with a declaration asserting in essence that the germ of the advertisement was his viewing of three local television news reports suggesting that users of galvanized hardware on recently constructed outdoor decks might be unwittingly exposing themselves to the risk of premature failure and collapse due to the heightened corrosiveness of the new pressure treatments. Gore then made various inquiries, including conversations with a Contra Costa County District Attorney's inspector whose views on the hazards of galvanized hardware had been a subject of the television reports. After learning of a Massachusetts suit against another manufacturer of galvanized fasteners and connectors, he ran the advertisement expecting to find persons who had actually used the described products and who "might be interested in filing a lawsuit as a plaintiff." At the time of drafting his declaration, he averred, he was in the process of preparing class action complaints against Simpson and the other manufacturers named in the ad.[4]
In opposition to the motion, Simpson argued that its causes of action were exempt from the anti-SLAPP statute by virtue of Code of Civil Procedure section 425.17, subdivision (c) (§ 425.17(c)), which excludes claims arising from representations of fact about the speaker's or a competitors products or services, or statements made in the course of delivering the speaker's products or services. Simpson contended, in the alternative, that it had demonstrated a probability of prevailing on its claims under section 425.16, subdivision (b)(1). It submitted several declarations including that of its engineering vice president, who declared that Simpson "manufactures its screws to industry standards" and that "[t]here is nothing defective about our screws and coatings. Our fastener products provide long and useful life when properly selected, installed, inspected and maintained."
Simpson also offered the declaration of statistician Michael Sullivan, who declared that he was hired by Simpson to "determine whether and to what extent" Gore's advertisement "injures [Simpson's] reputation and/or causes consumers to be less inclined to purchase its products." He caused a survey to be conducted by "intercept[ing] *298 214 shoppers in the parking lots of nine randomly selected Lowe's Home Improvement stores located in Northern and Southern California between January 28th and February 5th of 2006." Insofar as the results were disclosed by Simpson, they indicated that the advertisement reduced subjects' ratings of the quality of galvanized screws manufactured by Simpson, increased their estimate of the likelihood that the screws "would be defective," and reduced the reported likelihood that subjects would purchase galvanized screws manufactured by Simpson. No definition of "defective" was given to the subjects.
The trial court granted the special motion, stating in part, "The court finds that CCP § 425.17(c) does not apply because the statement was not made about a business competitor's products or services. Defendants have made a threshold showing that the statement was made in furtherance of their right of petition or free speech regarding an issue of public interest. (CCP § 425.16(e)(4).) The burden shifts to Plaintiff to demonstrate a probability of prevailing on the merits. Plaintiffs evidence is insufficient to establish that Defendants' advertisement is false." The court implicitly denied a motion by Simpson for relief from the statutory stay on discovery (§ 425.16, subd. (g)) in order to "conduct limited discovery of Pierce Gore and Gore Law Firm on the subject of actual malice...."
The court thereafter entered judgment. Simpson filed this timely appeal from both the judgment and the order granting the special motion to strike.

DISCUSSION

I. General Principles; Standard of Review

A. Mode of Proceeding; Burden of Persuasion

The anti-SLAPP statute provides for a special motion to strikein effect, to summarily dismissa cause of action that (1) tends to chill the defendant's rights of speech and petition, and (2) lacks demonstrable merit.[5] It is said that ruling on such a motion involves "a two-step process. First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. The moving defendant's burden is to demonstrate that the act or acts of which the plaintiff complains were taken `in furtherance of the [defendant's right of petition or free speech under the United States or California Constitution in connection with a public issue,' as defined in the statute. (§ 425.16, subd. (b)(1).) If the court finds such a showing has been made, it then determines whether the plaintiff has demonstrated a probability of prevailing on the claim. Under section 425.16, subdivision (b)(2), the trial court in making these determinations considers `the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based.'" (Equilon Enterprises v. Consumer Cause, Inc. (2002) 29 Cal.4th 53, 67, 124 Cal.Rptr.2d 507, 52 P.3d 685 (Equilon).)
This approach is perfectly sound as far as it goes, but it fails to account for a third issue that may arise in this context, and which is central to this appeal: whether *299 the plaintiffs cause of action, though arising from protected activity as described in section 425.16, is exempted from the operation of that statute because it falls within a statutory exclusion. Here, for instance, Simpson does not contest the premise that its complaint arises from conduct described in, and protected by, section 425.16. It contends, however, that its claims are excluded from the operation of that statute by section 425.17(c), which states that section 425.16 "does not apply" to certain causes of action. Such a contention requires that we consider who bears the burden of persuasion with respect to the applicability of such an exemptionthe party invoking the anti-SLAPP law (i.e., the defendant), or the party invoking the exemption (the plaintiff)?
One court has imposed this burden on the moving defendant. (Brill Media Co., LLC v. TCW Group, Inc. (2005) 132 Cal. App.4th 324, 33 Cal.Rptr.3d 371 (Brill).) Its analysis seems to rest on the supposition, which it attributes to Equilon, that every anti-SLAPP motion entails a "two-prong burden-shifting procedur[e]." (Id. at p. 331, 33 Cal.Rptr.3d 371.) From this it reasons, essentially by process of elimination, that the applicability of an exemption must be a "first prong determination," such that the defendant bears the burden of establishing that the cause of action is not exempt. (Id. at p. 330, 33 Cal.Rptr.3d 371.)
We respectfully decline to adhere to this reasoning. The court in Equilon said nothing about the treatment of a claim of exemption. There was no such claim in that case. The court was concerned only with the two "prongs" first noted above, i.e., whether the cause of action arises from protected conduct, and whether the plaintiff has shown a likelihood of prevailing. We will not lightly cast aside the fundamental principle of stare decisis that decisions are authority only for matters actually decided in them. The reasons for that rule were summarized thus in Hart v. Burnett (1860) 15 Cal. 530, 598-599: "Chief Justice Marshall, in the case of Cohens v. The State of Virginia, [19 U.S. (6 Wheat.) 264, 5 L.Ed. 257] (6 Wheat. 399) thus defines the rule: `It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which these expressions are used; if they go beyond the case, they may be respected, but they ought not to control the judgment in a subsequent suit where the very point is presented for decision. The reason of this maxim is obvious. The question actually before the Court is investigated with care, and considered in its full extent. Other principles which may serve to illustrate it, are considered in their relation to the case decided, but their possible bearing on all other cases is seldom investigated.' Chief Justice Best, in Richardson v. Mellish, (2 Bingham, 248) says: `The expressions of every Judge must be taken with reference to the case on which he decides, otherwise the law will get into extreme confusion. That is what we are to look to in all cases. The manner in which he is arguing is not the thingit is the principle he is deciding.'"
The "two-pronged analysis" attributed to Equilon in Brill was not even a reason for the former decision's holding but rather a description or model of the approach to be taken where, as there, the only issues are whether the cause of action arises from protected activity and whether the plaintiff is likely to prevail. The court clearly gave no thought to, let alone "investigated with care, [or] considered in its full extent," the possible application of its analysis "to a claim of exemption from the anti-SLAPP law. Its reasoning has no bearing on that issue, and furnishes no *300 authority for imposing upon a moving defendant the burden of negating the possibility that the plaintiffs cause of action falls within an exemption to the anti-SLAPP statute.
There is, however, a well recognized general principle that directly governs this issue: "One claiming an exemption from a general statute has the burden of proving that he comes within the exemption." (Norwood v. Judd (1949) 93 Cal.App.2d 276, 282, 209 P.2d 24; see In re Lorenzo C. (1997) 54 Cal.App.4th 1330, 1345, 63 Cal.Rptr.2d 562; Irwin v. Mascott (N.D.Cal.1999) 96 F.Supp.2d 968, 980; Goodrow v. Lane Bryant, Inc. (2000) 732 N.E.2d 289, 294 [432 Mass. 165].) For purposes of this rule, section 425.16(c)(1) is a "general statute." It prescribes a procedure applicable to a described class of claims. The statutory exclusions, including the one invoked by Simpson, exempt certain claims from the prescribed procedure even though they fall within the described class. Under the principle just cited Simpson, as the party claiming such an exemption, has the burden of establishing its applicability.

B. Standard of Review

It is settled that an appellate court independently reviews the questions whether a cause of action rests on protected activity, and whether the plaintiff has shown a probability of prevailing. (Contemporary Services Corp. v. Staff Pro Inc. (2007) 152 Cal.App.4th 1043, 1052, 61 Cal. Rptr.3d 434; Premier Medical Management Systems, Inc. v. California Ins. Guarantee Assn. (2006) 136 Cal.App.4th 464, 472, 39 Cal.Rptr.3d 43.) We see no reason to think that a different standard of review governs the applicability of a statutory exemption to the plaintiff's cause of action. We will therefore exercise our independent judgment with respect to all three questions.[6]

II. Anti-SLAPP Exemption

A. Statement About Defendant's or a Competitor's Product or Services

Section 425.17(e) exempts from the anti-SLAPP law certain causes of action that arise from statements of that either (1) concern the speaker's or a competitor's products or services, or (2) are made in the course of delivering the speaker's product's or services.[7] Although the exemption *301 has been described as applying to claims arising from "commercial speech" (Contemporary Services Corp. v. Staff Pro Inc. (2007) 152 Cal.App.4th 1043, 1047, 1053, 61 Cal.Rptr.3d 434; Foundation for Taxpayer and Consumer Rights v. Garamendi (2005) 132 Cal.App.4th 1375, 1391, 34 Cal. Rptr.3d 368), that description is substantially overbroad.[8] To fall within the exemption, a cause of action must satisfy several fairly concrete and specific criteria: (1) the defendant must be "a person primarily engaged in the business of selling or leasing goods or services" (§ 425.17(c)); (2) the plaintiffs cause of action must "arise[ ] from a[ ] statement or conduct by" the defendant (ibid.); (3) the statement or conduct must be of a type qualifying the cause of action for exemption (§ 425.17, subd. (c)(1)); and (4) the statement must be addressed to or intended to reach a qualifying audience, or be made in a qualifying setting (id., subd. (c)(2)).
It is not here disputed that Gore is in the business of selling legal services, that Simpson's cause of action arises from a statement by Gore, or that the statement was addressed to a qualifying audience. The point of dispute is whether the statement is the type specified in the statute. To trigger the exemption, the statement from which the cause of action arises must either (1) meet specified criteria of content and purpose, or (2) be made in the course of delivery of goods or services. We will characterize these alternatives as the content exemption and the delivery exemption, respectively.
The content exemption shields a cause of action against summary dismissal under the anti-SLAPP statute if the cause of action arises from a statement that "consists of representations of fact about [the speaker's] or a business competitor's business operations, goods, or services," and was "made for the purpose of obtaining approval for, promoting, or securing sales or leases of, or commercial transactions in, the person's goods or services...." (§ 425.17, subd. (c)(1).) There appears to be no dispute, and little room for doubt, that Gore's advertisement satisfies the purpose element of the exemption. It appears obvious, and Gore does not deny, that he ran the advertisement to promote the services he acknowledges he is in the business of providing. The question, then, is whether Simpson's cause of action arises from any statement "consist[ing] of [a] representation[ ] of fact about [Gore's] or a business competitor's business operations, goods, or services...." (See ibid.)
Simpson asserts in its opening brief that its claims arise from "Gore's false assertion that Simpson's galvanized screws are defective." As is discussed in greater detail below, no such assertion can be fairly attributed to Gore's advertisement. But even if it could, such an assertion is not "about" Gore's or a competitor's "business operations, goods, or services ...." (§ 425.17, subd. (c)(1).) It is, rather, a statement "about" Simpsonor more precisely, Simpson's products. It therefore falls squarely outside the content-based exemption.
Simpson seeks to avoid this seemingly obvious conclusion by attributing to the advertisement, the statute, or both, meanings they cannot reasonably be understood *302 to convey. Thus Simpson asserts that the advertisement contains "factual representations" that "Gore has investigated the named companies and has discovered that they are selling defective screws...." But this simply is not so. The advertisement neither says nor implies anything about any previous investigation by Gore or anyone else. Some readers might surmise that Gore conducted an investigation. Others might suppose he had heard or read about issues with Simpson's products. Some might fancy he was making things up out of whole cloth. Reasonable readers would refrain from any such speculation, since the advertisement affords no basis for it. The statutory exemption does not extend to every statement that might precipitate unbridled guesswork about the speaker's business-related activities by unusually imaginative readers. It applies only to factual representations that are about the speaker's own, or a competitor's, products or services.
Moreover, even if Gore had said, "I investigated Simpson and found its products defective," Simpson's cause of action would arise not from the statement about Gore ("I investigated and found") but from the statement about Simpson ("it's products [are] defective"). The same point defeats Simpson's attempt to attribute to the ad the "factual representation" that "Gore will provide the service of investigating to determine whether someone responding to the advertisement has a potential claim." Certainly the advertisement conveys such an implication, and we may assume for present purposes that it constitutes a "factual representation" about Gore's services. The problem is that Simpson's claims do not "arise from" Gore's offer to investigate. They arise from the supposed implication that Simpson's products are defective. The exemption does not extend to every cause of action arising from a statement accompanied by factual representations about the speaker's services. It extends only to causes of action arising from statements "consisting] of representations of fact about [the speaker's] or a business competitor's business operations, goods, or services." (§ 425.17(c)(1).) To the extent that Gore's advertisement "consists of representations about his services, Simpson's action does not "arise[ ] from" it; to the extent that Simpson's action "arise[s] from" a representation by Gore, the representation was not "about" Gore's or a competitor's services or business operations.
Indeed, Simpson elsewhere implicitly concedes that its cause of action does not arise from any representation about Gore by insisting that Gore could have obviated any claim by running substantially the same advertisement without Simpson's name. Simpson writes in its opening brief that Gore could have "compose[d] his advertisement in a way that did not defame Simpson" by stating simply, "If your deck was built after January 1, 2004 with galvanized screws, you may have certain legal rights and be entitled to monetary compensation, and repair or replacement of you[r] deck." This assertion is accompanied by a mock-up of Gore's ad with the amended text, offered to illustrate how "easy for Gore" this would have been. In the trial court, the mock-up was accompanied by the statement, "Simpson only wants its name out of any advertisement that falsely asserts Simpson's galvanized screws are defective." These statements confirm the obvious: This action arises from Gore's statements about Simpson and its products, not from any representation about his own or a competitor's services.
The content exemption requires the party invoking it to identify a statement or instance of conduct that (1) "consist[s] of representations of fact," (2) is "about" the *303 speaker's or a competitor's business, product, or service, and (3) gives rise to the cause of action sought to be exempted. These elements must coincide in a single "representation[ ]," or the exemption is inapplicable by its terms. Here any express or implied representations about Gore were unrelated to Simpson's causes of action, which arose entirely from Gore's statements about Simpson. Since Simpson was not Gore's competitor, the exemption was inapplicable.

B. Statement During Delivery of Services

Nor does Simpson's cause of action fall within the second exemption of section 425.17(c)(1), because Gore's advertisement was not a statement made "in the course of delivering" his "services."
For section 425.17(c) to apply at all, the defendant must be "a person primarily engaged in the business of selling or leasing goods or services ...." (§ 425.17(c).) It is these "goods or services"the ones the defendant is "in the business of selling or leasing"that the Legislature manifestly had in mind when it referred in section 425.17(a)(1) to statements made "in the course delivering the person's goods or services...." (See Stillwell v. State Bar (1946) 29 Cal.2d 119, 123, 173 P.2d 313 ["[I]t is a well-established rule of construction that when a word or phrase has been given a particular scope or meaning in one part or portion of a law it shall be given the same scope and meaning in other parts or portions of the law"]; People v. Dillon (1983) 34 Cal.3d 441, 468, 194 Cal.Rptr. 390, 668 P.2d 697 ["[I]t is generally presumed that when a word is used in a particular sense in one part of a statute, it is intended to have the same meaning if it appears in another part of the same statute"].) Accordingly, for the delivery exemption to apply, the statement in question must occur while the defendant is providing the goods or services he is in the business of selling.
The services an attorney typically "sell[s]" include counseling, advice, legal research, drafting of instruments, investigation, discovery, representation in litigation, and representation in negotiations or other dealings with third parties. An attorney does not sell advertising, and advertising is not a "business" in which he is "primarily engaged." Certainly it was not a business or activity in which Gore was engaged when he caused the subject advertisement to appear.[9] When an attorney advertises for clients, he is simply not delivering any services he is in the business of providingwhich are the only "services" whose "delivery" may trigger the exemption.[10]
In its opening brief Simpson attempts to surmount this obstacle by reading the phrase delivering services to include any "attempt to deliver services," which it then implicitly construes to include any act in anticipation of or preparation for the delivery of services. (Italics added.) Thus it contends that the exemption applies because *304 Gore stated that he "published the advertisement `in advance of class action litigation he intend[ed] to file,'" to the "`end' of preparing a lawsuit," and "`to further the anticipated class action litigation.' " Simpson also notes Gore's averment that "he was `drafting and preparing class-action complaints against Simpson'" and others. Simpson acknowledges that "this attempt was unsuccessful," in that Gore never filed such a suit, but finds that fact "inconsequential" to the application of the exemption "since the advertisement was part and parcel of services typical of Gore's law practice." But the exemption does not extend to attempts to deliver services, let alone acts in preparation for delivering services. It extends only to the actual provision (delivery) of the services the defendant is in the business of selling. A grocer, no less than Gore, advertises his wares "in advance of sales he "intend[s]" to make. Such advertising may be "part and parcel" of his retail business. This does not make advertising part of the goods or services sold by a grocer, any more than of those sold by an attorney.
Simpson also asserts that Gore's advertisement qualified under the delivery exemption because, borrowing language from Brill, supra, 132 Cal.App.4th 324, 341, 33 Cal.Rptr.3d 371, the ad was "typical of what Gore does as part of `the type of business transaction engaged in by' him...." However we must again respectfully decline to follow that case. Although the facts of that controversy were complex, it appears essentially to have been an action by a borrower who alleged that the defendant lenders had wrongfully interfered with his attempts to sell assets, thereby rendering him insolvent and forcing him into default for their own advantage. The defendants asserted that the claims were subject to an anti-SLAPP motion because section 425.16 covered their filing of petitions placing the plaintiff in bankruptcy. We fail to perceive, and the opinion does not explain, how this conduct could be viewed as occurring in the course of "delivering" a "service" sold by the defendants. The court's entire treatment of the question consists of the following two sentences: "These statements were made and conduct engaged in as part of an effort to secure control of the Brill Media entities. Securing control of the Brill Media entities was the type of business transaction engaged in by defendants." (Brill, supra, 132 Cal.App.4th at p. 341, 33 Cal. Rptr.3d 371.)
The Legislature has not chosen to exempt conduct incidental to the "type of business transaction engaged in by [the] defendant[]." (Brill, supra, 132 Cal. App.4th at p. 341, 33 Cal.Rptr.3d 371.) It has instead prescribed a much narrower exemption, predicated by its plain terms on conduct in the course of delivering the goods or services the defendant is in the business of selling or leasing. Placing borrowers in bankruptcy may have been the kind of thing the Brill defendants profited by doing, but it does not appear to have been a "service" they delivered (or sold or leased) to anyone. The control of "turf may be a common feature of organized crime, and eliminating rivals may be "the type of business transaction engaged in" by gang bosses. But it does not follow that by ordering a killing for that purpose, a boss is delivering any service he is in the business of selling.[11] So too, a cropduster may be engaging in a transaction typical of his business when he purchases spray and *305 fuel, but that hardly means he is "delivering" his "services" by making such a purchase.
In its reply brief Simpson suggests that Gore's advertisement constituted "the delivery of services to the general public...." An advertisement warning of possible hazards associated with a product may indeed constitute a public "service" in the sense of a favor or beneficence. (See American Heritage College Diet. (3d ed.1997) p. 1246 [defining "service" as "[a]n act of assistance or benefit to another or others"]; Merriam-Webster's Collegiate Diet. (10th ed.1999) p. 1067 ["a helpful act"].) But the statute does not use the word "service" in that sense. Indeed, it does not speak of "service" at all, but of "services," and in a purely commercial context, i.e., as performed by "a person primarily engaged in the business of selling or leasing goods or services." (§ 425.17(c).) "Services" thus contemplates not altruistic acts but "[w]ork done for others as an occupation or business." (American Heritage College Dict., supra, p. 1246; see Merriam-Webster's Collegiate Diet., supra, p. 1067 ["useful labor that does not produce a tangible commodityusu. used in pl. s>"].) An attorney's advertisement in anticipation of class action litigation is not "work done for others" or "useful, labor" for which an attorney can "charge." It is not "services" for purposes of the delivery exemption.
Simpson also suggests that the statute must be read to embrace the delivery of services to prospective clients because it contemplates statements addressed to a "potential buyer or customer ...." (§ 425.17, subd. (c)(2).) But the reference to "potential" buyers operates to harmonize the "intended audience" element of the statute (§ 425.17, subd. (c)(2)) with the content exemption discussed ante. (See id., subd. (c)(1).) That exemption expressly extends to statements made for the purpose of "obtaining approval for, promoting, or securing sales ... of ... the [speaker's] goods or services...." (Id., subd. (c)(1).) To limit the "intended audience" to actual or existing customers would severely limit, if not conflict with, this language. The reference to "potential" customers avoids that effect. It does not operate in derogation of the distinct exemption for statements "made in the course of delivering ... goods or services." (Ibid.)
We do not hold that services can never be delivered to a prospective customer for purposes of the delivery exemption. A different case would be presented if, for instance, an attorney made a phone call on behalf of a prospective client by whom he had not been formally retained. This is not such a case. The advertisement in question was seeking business from prospective clients, not delivering services to them. The delivery exemption is inapplicable to such a communication.

C. Conformity to Legislative Purpose

We have granted Gore's motion for judicial notice of legislative materials concerning the enactment of section 425.17. These materials are cited by Gore and amici California First Amendment Coalition (CFAC) and California State Senator Sheila Kuehl in support of the proposition that section 425.17 was never intended to exempt claims such as Simpson's from the anti-SLAPP statute.[12]
*306 It is not strictly necessary to reach this contention, because we detect no ambiguity by which the statutory language might be construed to exempt Simpson's claims. In the absence of such an ambiguity there is generally no occasion to delve into extrinsic evidence of legislative intent. (California Highway Patrol v. Superior Court (2008) 158 Cal.App.4th 726, 735, 70 Cal.Rptr.3d 280 (California Highway Patrol); Gardenhire v. Superior Court (2005) 127 Cal.App.4th 882, 894-895, 26 Cal.Rptr.3d 143.) However, "[t]he literal meaning of unambiguous statutory language 'may be disregarded to avoid absurd results or to give effect to manifest purposes that, in the light of the statute's legislative history, appear from its provisions considered as a whole.'" (California Highway Patrol, supra, 158 Cal.App.4th at p. 736, 70 Cal.Rptr.3d 280, quoting Silver v. Brown (1966) 63 Cal.2d 841, 845, 48 Cal.Rptr. 609, 409 P.2d 689.) Therefore we have reviewed the proffered materials out of an abundance of caution. (See also Equilon, supra, 29 Cal.4th 53, 61-62, 124 Cal.Rptr.2d 507, 52 P.3d 685.)
Our application of section 425.17(c) is entirely consistent with the statutory purpose reflected in the legislative history. Indeed, these materials establish that it would be absurd, if not perverse, to grant Simpson the shelter of the statutory exemptions.
The impetus for enacting the exemptions was the growing use of anti-SLAPP motions by commercial enterprises seeking to impede or obstruct litigation brought against them by public-interest or consumer class plaintiffs. As reflected in a senate committee report, anti-SLAPP motions were themselves being used as a kind of SLAPP to inhibit litigation against well-heeled defendants. Senate Bill 515, which became section 425.17, was proposed by the Consumer Attorneys of California (CAOC), who complained that "in recent years, a growing number of large corporations have invoked the anti-SLAPP statute to delay and discourage litigation against them by filing meritless SLAPP motions, using the statute as a litigation weapon." (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 515 (2003-2004 Reg. Sess.), as amended May 1, 2003, p. 4.) It was noted that seminars were being given on how to utilize the anti-SLAPP statute against consumer rights actions. (Ibid.) Another proponent asserted that "a simple pro bono public interest case that should be completed in six months with $5,000 in expenses becomes a costly and financially risky ordeal when the anti-SLAPP law is misused. The filing of the meritless SLAPP motion by the defendant, even if denied by the court, is instantly appealable, which allows the defendant to continue its unlawful practice for up to two years, the time of appeal." (Ibid.) Section 425.17 was necessary, proponents argued, "to stop corporate abuse of the statute and to return Section 425.16 to its original purpose of protecting a citizen's rights of petition and free speech from the chilling effect of expensive retaliatory lawsuits brought against them for speaking out." (Ibid.)
The report quoted Professor Penelope Canan, the "co-author of the seminal research on SLAPP suits," who had written *307 in support of an earlier proposed exemption that by using meritless motions under section 425.16 "`as a litigation weapon,' corporate defendants had `turn[ed] the original intent of one of the country's most comprehensive and effective anti-SLAPP laws on its head.'" (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 515 (2003-2004 Reg. Sess.), as amended May 1, 2003, at p. 5; see Pring Canan, SLAPPs: Getting Sued for Speaking Out (1996); Canan, et al., Political Claims, Legal Derailment, and the Context of Disputes (1990) 24 L. & Soc'y Rev. 923; Canan & Pring, Studying Strategic Lawsuits Against Public Participation: Mixing Quantitative and Qualitative Approaches (1988) 22 L. & Soc'y Rev. 385.) The report also noted commentary by Professor Canan and others to the effect that since a SLAPP suit depends for its effectiveness on the economic burden and risk it imposes on the defendant, the concept has little if any application to actions against large commercial enterprises, which "`have far greater resources to defend themselves when sued, and as a group are far less likelyor not likely at allto be chilled in the exercise of their First Amendment Rights.'" (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 515 (2003-2004 Reg. Sess.), as amended May 1, 2003, p. 5.)
Here a seemingly large commercial enterprise has attempted to use the new exemptions to perpetuate a lawsuit that may fairly be described as a paradigmatic SLAPP in that it plainly arises from conduct protected by the anti-SLAPP statute and, as will appear momentarily, lacks substantial merit. To permit this effort to succeed would be a perversion of legislative purpose at least as striking as the one that motivated the Legislature to enact the exemptions Simpson invokes. As applied in this case, at least, the plain meaning of the statute, and the result it produces, is wholly consistent with its purpose. The legislative history only confirms our conclusion that Simpson's claims are subject to scrutiny under the anti-SLAPP law.

III. Probability of Prevailing

A. Procedural Principles

Once it is determined that a cause of action is subject to a special motion to strike, the plaintiff is required to establish "a probability that [he] will prevail on the claim." (§ 425.16, subd. (b)(1).) "In order to establish a probability of prevailing on the claim [citation], a plaintiff responding to an anti-SLAPP motion must `"state[] and substantiate[] a legally sufficient claim."' [Citations.] Put another way, the plaintiff `must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.' [Citations.] In deciding the question of potential merit, the trial court considers the pleadings and evidentiary submissions of both the plaintiff and the defendant (§ 425.16, subd. (b)(2)); though the court does not weigh the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiffs attempt to establish evidentiary support for the claim. [Citation.]" (Wilson v. Parker, Covert & Chidester (2002) 28 Cal.4th 811, 821, 123 Cal. Rptr.2d 19, 50 P.3d 733; Vogel v. Felice (2005) 127 Cal.App.4th 1006, 1017, 26 Cal. Rptr.3d 350 (Vogel); see Navarro v. IHOP Properties, Inc. (2005) 134 Cal. App.4th 834, 840, 36 Cal.Rptr.3d 385 [plaintiff must show "reasonable probability of prevailing"].)

B. Defamatory Utterance

To establish a libel, the plaintiff must show that the defendant published *308 a "false and unprivileged" statement that "exposes [the plaintiff] to hatred, contempt, ridicule, or obloquy, or ... causes him to be shunned or avoided, or ... has a tendency to injure him in his occupation." (Civ.Code, § 45.) The requirement of falsity rests on the nearly absolute constitutional protection granted to truthful speech. (See Gregory v. McDonnell Douglas (1976) 17 Cal.3d 596, 600-601, 131 Cal.Rptr. 641, 552 P.2d 425 (Gregory).) Because the law does not recognize the possibility of a false opinion, a claim for defamation cannot succeed unless the challenged statement can be reasonably understood to express or imply a provably false assertion of fact. (Kahn v. Bower (1991) 232 Cal.App.3d 1599, 1607, 1608, 1609, 284 Cal.Rptr. 244.) "If the meaning conveyed cannot by its nature be proved false, it cannot support a libel claim." (Vogel, supra, 127 Cal.App.4th at p. 1020, 26 Cal. Rptr.3d 350.)
A statement is not false for purposes of a defamation claim if it is substantially true. (Vogel supra, 127 Cal. App.4th at p. 1021, 26 Cal.Rptr.3d 350.) Liability is precluded "`"if the substance of the charge be proved true, irrespective of slight inaccuracy in the details." [Citations.] ... [Citation.] ... Minor inaccuracies do not amount to falsity so long as "the substance, the gist, the sting, of the libelous charge be justified." [Citations.] Put another way, the statement is not considered false unless it "would have a different effect on the mind of the reader from that which the pleaded truth would have produced." [Citations.]' (Masson v. New Yorker Magazine (1991) 501 U.S. 496, 516-517[, 111 S.Ct. 2419, 115 L.Ed.2d 447] ..., italics added [discussing California law].)" (Ibid., fn. omitted.) Thus, to establish liability it is not enough that the challenged statement be false in one respect, but injurious to reputation in another. Its provably false factual meaning must coincide with its defamatory "gist" or "sting." (See Smith v. Maldonado (1999) 72 Cal.App.4th 637, 646-647, 85 Cal. Rptr.2d 397 ["It is sufficient if the defendant proves true the substance of the charge, irrespective of slight inaccuracy in the details, `so long as the imputation is substantially true so as to justify the "gist or sting" of the remark'"].)
In ascertaining the gist of a publication, "`a court is to place itself in the situation of the hearer or reader, and determine the sense or meaning of the language of the ... publication according to its natural and popular construction.' That is to say, the publication is to be measured not so much by its effect when subjected to the critical analysis of a mind trained in the law, but by the natural and probable effect upon the mind of the average reader." (MacLeod v. Tribune Pub. Co. (1959) 52 Cal.2d 536, 547, 343 P.2d 36; Morningstar, Inc. v. Superior Court (1994) 23 Cal.App.4th 676, 688, 29 Cal.Rptr.2d 547.)
In view of these principles, Simpson could only show a likelihood of prevailing on its defamation claim by showing that a jury could find Gore's advertisement had the effect of conveying to the average reader an assertion of fact that was provably false and was more damaging to Simpson than the truth would have been. Simpson's main argument on this point is most cogently stated as follows: "[I]t is provably false that Simpson's screws are defective because Simpson gave ample warnings of the risks from using galvanized screws with pressure-treated wood and provided clear recommendations for proper use of its screws...." Later Simpson explains further: "A product may be `defective' because of (1) a manufacturing defect, (2) a design defect, or (3) a failure to warn of foreseeable risks of *309 harm posed by the product. [Citations.] Gore does not claim any manufacturing or design defect in Simpson's products, and he does not assert any particular failure or defect of a Simpson fastener actually observed anywhere. His theory of defective product liability therefore must be failure to warn. [Record citations.] [¶] Yet the record is replete with evidence of warnings by Simpson sufficient to preclude any defective product liability on a failure-to-warn theory." (Italics added.)
It thus appears that the points essential to Simpson's main claim of provable falsity are the following: (1) The gist of Gore's advertisement was that Simpson's galvanized screws "are defective"; (2) Simpson's screws are only "defective" if Simpson would be held liable in a products liability suit; (3) Simpson could not be held liable in a products liability suit because it took adequate steps to inform the public about the hazards of using its galvanized screws with pressure-treated wood; (4) therefore the screws were not defective and the imputation to the contrary was false.
Three of these four propositions are demonstrably unsound.[13] First and most obviously, even if the gist of the advertisement were that Simpson's products "are defective," falsity could not be demonstrated by determining the outcome of a hypothetical products liability suit. To the average reader of a general circulation newspaper, the meaning of "defective" is not determined by the law of products liability but by common usage. Simpson's argument thus falls prey to the precise error decried in MacLeod v. Tribune Pub. Co., supra, 52 Cal.2d at page 547, 343 P.2d 36, i.e., it "measure[s]" the challenged publication "by its effect when subjected to the critical analysis of a mind trained in the law...."
Further, the gist of the advertisement is not that Simpson's galvanized screws "are defective," or "are so defective they subject Simpson to liability." The word "defective" nowhere appears in the advertisement. To the average reader, the advertisement would at most suggest that some of Simpson's galvanized screws were unsuitable for use in specified applications and that persons who used them might have a remedy against someone. This is not a provably false assertion of fact for several reasons: (1) insofar as it asserted any fact about Simpson's galvanized screws, it did not substantially diverge from the truth as admitted by Simpson in its complaint; (2) it is in any event explicitly couched in terms not of fact but of possibility; and (3) insofar as it alludes to the possibility of a right to relief, it is explicitly predictive and thus cannot be understood to assert a proposition of fact because it is almost universally understood that no one knows the future.
Simpson has conceded time and again that many of its galvanized screws are wholly unsuitable for use in pressure treated wood decks. According to a "connector coating recommendation" table in a Simpson publication attached to the declaration of Simpson engineer Crawford, Simpson manufactured three categories of fasteners and connectors: "G90" galvanized, "ZMAX/HDG" galvanized, and stainless steel.[14] G90 products are recommended *310 for exterior use only in "dry" untreated wood. In other words, Simpson does not consider them suitable for use in any exterior pressure-treated wood application. ZMAX/HDG products are recommended for exterior pressure-treated woods only when the wood contains no ammonia. In all other exterior applications, and all other pressure-treated wood applications (interior or exterior), Simpson recommends the use of stainless steel connectors and fasteners.
In sum, G90 galvanized screws are deemed unsuitable for all pressure-treated woods and all exterior applications other than "dry" ones; and all galvanized screws are deemed unsuitable for any pressure-treated wood containing ammonia. For some outdoor treated-wood applications, then, all galvanized screws are deemed unsuitable. As Simpson acknowledges, the risk of using the wrong screw in the wrong application is that the screw may corrode to the point of failure, which in turn may produce structural collapse. It therefore seems fair to say that many if not all Simpson galvanized screws were dangerous to use in at least some outdoor treated-wood applications.
If Gore's advertisement had flatly stated, "Simpson galvanized screws are unsuitable for use in wood decks," it would be true with one qualification: some galvanized hardwarethe ZMAX/HDG linemay be suitable for use with some exterior pressure treated woods. But even there, Simpson's literature is pervaded with warnings and disclaimers the gist of which is that all doubts should be resolved against galvanized hardware and in favor of stainless steel. Thus, after advising users to obtain comprehensive information from wood suppliers, Simpson states, "If the needed information is not provided then Simpson would recommend the use of Stainless Steel connectors and fasteners." Likewise, for woods not listed on the selection table, Simpson states that it "cannot make any recommendation other than the use of Stainless Steel with that product." Further, even though ZMAX/HDG hardware is described as suitable for use with ammonia-free woods in "exteriorwet" applications, Simpson issues the following disclaimer in a footnote: "Test results indicate that ZMAX/HDG will perform adequately, subject to regular maintenance and periodic inspection. However, the nationally-approved test method used, AWPA E12-94, is an accelerated test, so data over an extended period of time is not available. If uncertain, use Stainless Steel."
Gore's advertisement would thus diverge substantially from the facts admitted by Simpson only if it were understood as an absolute and categorical assertion that no galvanized hardware is suitable for use on wood decks. We do not believe any rational reader could interpret the advertisement to convey such a message. Far from making a direct and categorical assertion that all galvanized screws are unsuitable, it implies that some unknown number of galvanized screwspossibly all, possibly many, possibly few, possibly noneare unsuitable for the specified purpose. The substantial accuracy of this statement appears from Simpson's own product literature.
Further, in anticipating the investigation of "potential claims," Gore's advertisement conveyed not an assertion of existing fact but a prediction of future events. The vast majority of newspaper readers understand the future to be unknowable and unprovable, such that a statement about it is incapable of proof or disproof. To be sure, a prediction may be eventually be borne out by events, in which case we say that it "came true." But this does not mean that it was provably true when *311 made. And perhaps more importantly, when a prediction is not borne out by events, we do not ordinarily characterize it as false, but as inaccurate, meaning only that it missed its mark, as an arrow misses its target. This linguistic difference reflects the universal understanding that the future does not exist. Like anything that does not exist, it cannot be spoken of in factual terms, but only in suppositional or probabilistic ones. In general, therefore, a prediction of future events is intrinsically incapable of conveying a provable (or disprovable) assertion of fact.
Moreover, contrary to the implication alleged by Simpson, the advertisement neither states nor implies that Simpson's products "are defective," or are anything else. Rather it states that persons who used Simpson's galvanized screws in a stated manner "may" have a "potential claim" to relief, subject to "investigat[ion]" by Gore. This implies no facts at all. Rather it speaks of a possible state of fact, the actual existence of which is subject to two intervening contingenciesone express (investigation) and the other implied (litigation). A statement will not ordinarily be deemed factual when it is "cautiously phrased in terms of apparency." (Gregory, supra, 17 Cal.3d 596, 603, 131 Cal.Rptr. 641, 552 P.2d 425.) Here Gore's advertisement is phrased not only in terms of apparency, but of apparent possibility. It does not assert that something is true or will happen, but only that something "may" be true. An assertion that "X may be Y" posits only some possibility that X is Y. Such a statement is true so long there is any possibility that X is Y. To prove it false, one must establish that X could not be Y. That is why one who speaks carefully will concede almost any proposition couched in terms of "may" or "might," perhaps with a grudging, "Anything is possible." Here, insofar as Gore's advertisement conveys the assertion that users of its galvanized screws "may" be entitled to legal relief, proof of literal falsity would require a demonstration that no reader could possibly be entitled to any relief, from anyone, on any theory or state of facts.
By its nature such a burden is practically impossible to carry. Certainly Simpson could not carry it here. The product literature submitted by Simpson establishes that the choice of correct hardware was both critical and potentially quite difficult unless buyers defaulted to the safer but much more expensive alternative of stainless steel. It would be astonishing if no deck owner or contractor used galvanized hardware in a situation where it created a danger of property damage and even personal injury. Assuming that Simpson's product warnings afforded it a bulletproof shield against liabilitya question we do not decideit was entirely possible that one or more owners of such improperly constructed decks had legally viable claims against wood manufacturers, wood retailers, or fastener retailers for selling their products without adequate warnings. Moreover, persons whose decks were built by contractors might have claims against the contractors for selecting unsuitable hardware. It would therefore be astonishing if it were not substantially true, and indeed literally true, that some readers of the advertisement might be entitled to legal relief. Indeed, it would be highly surprising if none of them were in fact entitled to relief. Certainly Simpson made no attempt to prove such an imposing negative, instead confining itself to the claim that it was not in fact liable because it gave adequate product warnings. Since the advertisement did not assert or imply that Simpson was in fact liable, Simpson's proofs did not meet the issue.
*312 A statement of opinion may sustain liability where it implies that the speaker knows additional, undisclosed defamatory facts. (See Milkovich v. Lorain Journal Co. (1990) 497 U.S. 1, 18, 110 S.Ct. 2695, 111 L.Ed.2d 1 ["If a speaker says, 'In my opinion John Jones is a liar,' he implies a knowledge of facts which lead to the conclusion that Jones told an untruth"]; Krinsky v. Doe 6 (2008) 159 Cal. App.4th 1154, 1175, 72 Cal.Rptr.3d 231 ["`[T]he communicator implies that a concealed or undisclosed set of defamatory facts would confirm his opinion'"].) Here Gore did the opposite: By conditioning any "potential claim" on further investigation, he directly implied that he did not knowand could not know without further investigationwhether Simpson or anyone else was liable. A reader might suppose that Gore possessed additional facts relevant to the question, but" no reasonable reader could suppose they facts established Simpson's liability, or indeed the actual existence of any "defect," because Gore himself impliedly pronounced them insufficient to do so.
Echoing an argument we have already addressed in the context of the statutory exemptions, Simpson contends that the advertisement conveyed three specific, provably false defamatory facts: "First, ... that Gore conducted an investigation and identified Simpson as one of three manufacturers of defective galvanized screws, so that all that remains is for Gore to find consumers who have those defective screws. Second, ... that Simpson's defective galvanized screws have failed in some instances, requiring Simpson to pay compensation. Third, ... that Simpson actually has been sued for defective product liability." (Italics added.) No reasonable reader could attribute such assertions to Gore's advertisement. It might suggest these possibilities to some readers, but there is a crucial difference between what is "implied" by a speaker and what is surmised by a listener. If a man says simply that he is tired, it might trigger speculation that he has loaded 16 tons of coal, or been chased by 20 hounds, or leapt a tall building at a single bound. It hardly implies any of these things. Similarly, Gore's advertisement might stimulate a fertile imagination to invent any number of colorful scenarios, but it implies nothing about any completed investigation by Gore, past failures of Simpson products, or past lawsuits. Indeed Simpson's attributed implications go so far as to contradict the words of the ad by suggesting that Gore only had to "find consumers who have these defective screws" to establish Simpson's liability. What the ad actually said was that Gore could investigate whether people who used Simpson's galvanized screws in specified circumstances had "a potential claim."
Simpson also contends that a finding of actionable defamatory meaning may be based upon the public opinion survey conducted at its behest after the publication of Gore's advertisement. The requirement of a provably false assertion of defamatory fact is grounded in the constitutional entitlement to speak truthfully. That entitlement is not subject to defeasance by plebiscite, let alone by private opinion survey. It is for the courts, as guardians of our constitutional liberties, to say whether a statement is the type that will permit a judgment for libel. That function cannot be delegated to anonymous citizens questioned by anonymous interrogators in public parking lots.
Further, the survey fails to show what Simpson claims for it, i.e., that "consumers understood Gore's advertisement to mean Simpson's galvanized screws are defective...." (Italics added.) What respondents were asked was the nebulous question, "How likely would it be that galvanized *313 screws manufactured by Simpson Strong-Tie would be defective?" (Italics added.) The available responses, in the order offered to respondents, were, "[v]ery [l]ikely>" "[s]omewhat [l]ikely," "somewhat unlikely," "[v]ery [u]nlikely," "[n]ot [s]ure," and "[d]on't [k]now." Simpson does not provide a complete breakdown of responses, choosing instead to disclose only that after seeing the advertisement, 46 percent of respondents "said they thought it was very likely or somewhat likely that the galvanized screws made by Simpson Strong Tie [sic] were defective."[15] (Italics added.) This result does not support the interpretation attributed to it by Simpson. What it shows is that an unknown proportion of respondents thought it "very likely" that Simpson's galvanized screws "would be defective" in some unspecified situation. To reach a number approaching one-half, Simpson had to combine that group's responses with those who thought this hypothesis "somewhat likely." But describing a proposition as "somewhat likely" is deeply ambiguous. It triggers all the concerns we have already expressed about the unprovability of statements of mere possibility. To be sure, ambivalent respondents were permitted to choose between "somewhat likely" and "somewhat unlikely," but logically those terms mean exactly the same thingthe posited proposition is possible, but the degree of probability cannot be estimated.
The survey is further crippled as evidence of defamatory meaning by its use of the highly inappropriate construction "would be." The term "would" signals a conditional propositione.g., X would be true if Y were true. (See Merriam-Webster's Collegiate Diet., supra, at p. 1361 [describing "would," as pertinent here, as an auxiliary verb "used ... in the conclusion of a conditional sentence to express a contingency or possibility "].) But no condition was specified. Worse, the verb "would" also operates "in [an] auxiliary function to express doubt or uncertainty," e.g., "the explanation [would] seem unsatisfactory." (Ibid.) Thus the construction used in the survey was not only logically incoherent in its allusion to an unspecified condition; it also connoted a pervasive uncertainty that made respondents' estimates of "likel[ihood]," already couched in highly ambiguous terms, all but meaningless. As a result, none of the permitted responses can be rationally construed as reflecting a belief that the screws "are defective." At most it showed that respondents who saw the advertisement were more likely to consider the possibility that Simpson's screws were "defective." The law of defamation is concerned with perceived derogatory facts, not vaguely disquieting possibilities.
Moreover, the survey failed to inform respondents what it meant by the characterization "defective," or ascertain what they meant insofar as they might accede to it. A survey more nearly tracking the meaning reasonably attributed to the advertisement would have asked respondents *314 whether the advertisement caused them to believe that some or all galvanized screws made by Simpson were unsuitable for use in wood decks after January 1, 2004, such that some users of those screws for that purpose might have a claim against someone. Since Simpson's own literature establishes the truth of this proposition, a survey couched in these termsand yielding results comparable to those actually gleanedwould establish that Gore's advertisement did, indeed, perform a public service. Instead the survey supplied the respondents with an attribution of "defective[ness]" that the advertisement cannot reasonably be understood to convey. That some respondents accepted the proffered imputation can hardly warrant attributing it to Gore. The law rightly mistrusts leading questions. It should not trust them more when they are posed out of court by anonymous interrogators to unsworn anonymous declarants.
Because the advertisement cannot be reasonably understood to convey a provably false assertion of fact, there was no possibility that Simpson could prevail on its libel claim. The trial court therefore acted properly in granting the anti-SLAPP motion as to that cause of action. This makes it unnecessary to consider the numerous other deficiencies Gore has asserted in connection with that cause of action.

C. Trade Libel

To establish liability for trade libel, a plaintiff must prove at least the following elements: (1) the defendant published a statement; (2) the statement tended to disparage the plaintiffs product or property; (3) the statement was provably false; (4) the defendant acted with knowledge that the statement was false or with reckless disregard for its falsity; and (5) the statement caused specific pecuniary damage to the plaintiff. (See 5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 645, pp. 951-952; Melaleuca, Inc. v. Clark (1998) 66 Cal.App.4th 1344, 1360-1362, 78 Cal.Rptr.2d 627.)
Simpson alleges that Gore's statements "disparaged Simpson's goods in that the Advertisement falsely communicates to the reader that Simpson's galvanized steel screws are defective, when they are not. Defendants assert that Simpson galvanized screws are so defective they subject Simpson to liability." We concluded above that Simpson cannot establish a provably false statement by Gore that was damaging to Simpson's reputation. The same goes for a false statement disparaging Simpson's product. The advertisement conveyed at most that Simpson's galvanized screws, or some of them, might be unsuitable for use in specified applications. Simpson admitted as much in its complaint. Even if it had not, such a proposition cannot be shown to have been provably false when made. Simpson cannot prevail on its trade libel claim.

D. False Advertising

In its third cause of action, Simpson alleges that Gore's advertisement, which was "used to solicit Defendants' legal services," asserted that "Simpson's galvanized screw products are defective when they are not," and also that they "are so defective that they subject Simpson to liability." These statements were "false and misleading," and Gore "knew, or should have known, that such assertions were false and misleading." Gore's conduct thus constituted false advertising subject to injunction under Business and Professions Code section 17500.[16]
*315 We have already concluded that the advertisement contained no provably false statement about Simpson or its products. The focus of Simpson's false advertising cause of action, however, is that the advertisement contains false statements "about Gore's services." According to Simpson, these consist of the express statement "that `an attorney' will `investigate whether you have a potential claim,'" and the "reasonably inferred" assertion "that Gore has investigated the named companies and has discovered that they are selling defective screws." The second assertion does not appear in, and cannot reasonably be attributed to, the advertisement. The first assertion is certainly impliedindeed, statedin the ad; but there is no suggestion that it was in any respect false. The ad says nothing about Gore except that he is an attorney, he can be reached at a specified number and address, and he will or may investigate the potential claims of persons who call him. There is no indication that any of these statements could be shown to be false. There is thus no apparent possibility of Simpson's prevailing on a false advertising claim.

E. Unfair Business Practices

In its fourth cause of action ("Unfair Business Practices"), Simpson claims an entitlement to an injunction and attorney fees because Gore "engaged in unfair business practices in violation of [section] 17200 et seq. of the California Business and Professions Code in that [he] utilized the false misleading Advertisement to recruit potential plaintiffs to participate in an unjustified class action lawsuit against Simpson." As we have concluded, Simpson lacks the apparent ability to establish that anything in the advertisement is "false and misleading."
We also observe that Simpson seeks only an injunction and ancillary attorney fees. "[A]n injunction serves to prevent future injury and is not applicable to wrongs that have been completed. An injunction is authorized only when it appears that wrongful acts are likely to recur." (Russell v. Douvan (2003) 112 Cal. App.4th 399, 402, 5 Cal.Rptr.3d 137.) There is no reason to suppose that Gore intends, or ever intended, to run further advertisements concerning Simpson, or otherwise threatens any future wrong against Simpson. We conclude that Simpson failed to establish the requisite likelihood that it would prevail on any of its causes of action.

IV. Denial of Discovery

The filing of Gore's anti-SLAPP motion stayed discovery except as the trial court might otherwise direct for good cause shown. (§ 425.16, subd. (g).) Simpson moved to conduct discovery on the issue of Gore's mental state in publishing the advertisement, and now challenges the trial court's failure to allow such discovery. Under our view of the issues, that question is academic. Simpson indirectly concedes as much, stating, "if this court concludes that Simpson's prima facie factual showing on defamation and trade libel is insufficient on the issue of actual malice, the court should remand the cause with directions to the superior court to allow limited discovery on that issue...." We have found it unnecessary to reach the question of Gore's mental state because his advertisement *316 cannot be shown to have conveyed a provably false defamatory meaning.

Disposition
The order and judgment appealed from are affirmed.
WE CONCUR: PREMO and ELIA, JJ.
NOTES
[1] We see no clear statement in the record of the size of the ad. Assuming the copy in the body of the complaint has not been enlarged or reduced, the ad was about 4 inches in width and 2-3/4 inches in height.
[2] Simpson also alleged that the advertisement is false in that it "communicates that the alleged problem is not widespread in the screw manufacturing industry, but is limited only to the three particular manufacturers identified." Simpson places no reliance on this allegation on appeal.
[3] The page continues, "Wood is placed inside a closed cylinder, then vacuum and pressure are applied to force the preservatives into the wood. The preservatives help protect the wood from attack by termites, other insects, and fungal decay." (See Pressure Treated Wood FAQs (as of Feb. 13, 2008).)
[4] It appears that no such lawsuit has ever been filed, at least by Gore.
[5] "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).)
[6] The constitutional shield for truthful speech may also implicate "the relatively searching standards of `"constitutional fact review," at least in considering whether the publication at issue conveys a provably false and defamatory assertion of fact. (O'Grady v. Superior Court (2006) 139 Cal.App.4th 1423, 1466, 44 Cal.Rptr.3d 72, quoting DVD Copy Control Association v. Bunner (2003) 31 Cal.4th 864, 889, 4 Cal.Rptr.3d 69, 75 P.3d 1; see Krinsky v. Doe 6 (2008) 159 Cal.App.4th 1154, 1161-1162, 72 Cal.Rptr.3d 231 (Krinsky).) Our analysis, however, makes it unnecessary to closely consider the issue.
[7] Section 425.17(c) provides, "Section 425.16 does not apply to any cause of action brought against a person primarily engaged in the business of selling or leasing goods or services, including, but not limited to, insurance, securities, or financial instruments, arising from any statement or conduct by that person if both of the following conditions exist: [¶] (1) The statement or conduct consists of representations of fact about that person's or a business competitor's business operations, goods, or services, that is made for the purpose of obtaining approval for, promoting, or securing sales or leases of, or commercial transactions in, the person's goods or services, or the statement or conduct was made in the course of delivering the person's goods or services. [¶] (2) The intended audience is an actual or potential buyer or customer, or a person likely to repeat the statement to, or otherwise influence, an actual or potential buyer or customer, or the statement or conduct arose out of or within the context of a regulatory approval process, proceeding, or investigation, except where the statement or conduct was made by a telephone corporation in the course of a proceeding before the California Public Utilities Commission and is the subject of a lawsuit brought by a competitor, notwithstanding that the conduct or statement concerns an important public issue."
[8] Because we find that Simpson's claims fall squarely outside the exemption's plain terms, it is unnecessary to resolve any question of whether Gore's advertisement is properly viewed as "commercial speech."
[9] Simpson seemed to all but acknowledge this fact in the trial court in contesting Gore's contention (which we do not reach) that his statements were privileged under Civil Code section 47, subdivision (b), because they were made in the course of a judicial proceeding. Insisting that the advertisement was too remote from any anticipated suit to be privileged, Simpson wrote, "Here, Defendants are simply advertising for business in the newspaper. There is no client, no dispute, and no demand." (Italics added.)
[10] Occasions may of course arise when an attorney's services to a client include publishing advertisements, or legal notices resembling advertisements. We are here concerned exclusively with an advertisement promoting the attorney's services by seeking clients to engage those services.
[11] To be sure, the boss might also offer to commit "contract" killings, and a "hit" pursuant to such an arrangement would plainly constitute the delivery of a service as contemplated in section 425.17(c)(1). We suspect, however, that the anti-SLAPP statute will not often be implicated in cases involving those or similar facts.
[12] Senator Kuehl authored the bill that became section 425.17. While she of course enjoys the same right as any other citizen to address our courts, she is no more competent than any other citizen to opine retrospectively upon the intent underlying a legislative act. (See C-Y Development Co. v. City of Redlands (1982) 137 Cal.App.3d 926, 932-933, 187 Cal. Rptr. 370 [legislators' after-the-fact statements about purpose of statute not admissible as aids to interpretation]; cf. City of King City v. Community Bank of Central California (2005) 131 Cal.App.4th 913, 924, fn. 5, 32 Cal.Rptr.3d 384 [legislator's intentions communicated to body prior to enactment "may well be admissible, at least where the purpose is to explain and illuminate a patently ambiguous enactment and not to impeach an otherwise valid one or alter a plain meaning otherwise facially apparent"].) We accept her arguments on this point as contentions of law, but not as evidence of legislative intent.
[13] Simpson understandably emphasizes the one colorable proposition advanced by it, i.e., that it took adequate steps to advise the public about the hazards of using galvanized hardware with pressure treated wood. Commendable as its efforts may be, they can have no bearing on this lawsuit unless the other three propositions are sound.
[14] The publication also refers to "painted" hardware, but that category appears immaterial here.
[15] The corresponding number for respondents who did not see the advertisement was six percent. It is no surprise that people are more likely to entertain the possibility of a proposition to which they have been exposed, however tentatively, than of one to which they have not been exposed. We also question the effect of making the most reasonable responses to the question"not sure" and "don't know"the last ones offered to respondents, thus arguably relegating those responses to a disfavored position. The advertisement and survey were, after all, an interruption in activities on which respondents were already embarkedentering a store to shop, or leaving the store for their next destination. Newspaper readers choose to engage in that activity, and may be expected to devote themselves somewhat more carefully to comprehending what they read.
[16] In its opening brief Simpson made no attempt to show that the elements of a false advertising claim are present. It referred specifically to that cause of action only to say that Simpson could prevail on it without having to establish a knowing or reckless falsehood. This hardly establishes the elements of such a claim. Because the opening brief failed to cogently assign error on this point, Gore argued that Simpson had "abandoned" its causes of action for false advertising and unfair business practices. We decline to decide the issue on grounds of abandonment.